## INTERSTATE COMMERCE COMMISSION ET AL. *v.* CITY OF JERSEY CITY ET AL.

No. 767.   Argued May 2, 3, 1944.—Decided May 29, 1944.

*Mr. E. M. Reidy,* with whom *Mr. Daniel W. Knowlton* was on the brief, for the Interstate Commerce Commission; and *Mr. John F. Finerty,* with whom *Messrs. John E. Buck* and *Thomas A. Halleran* were on the brief, for the Hudson & Manhattan Railroad Co., appellants.

*Mr. Charles Hershenstein,* with whom *Mr. Charles A. Rooney* was on the brief, for Jersey City; and *Mr. David F. Cavers,* with whom *Messrs. Richard H. Field, Harry R. Booth, Robert S. Keebler,* and *Herbert Sharfman* were on the brief, for the Economic Stabilization Director, appellees.

*Solicitor General Fahy* and *Mr. Chester T. Lane* filed a memorandum on behalf of the United States, urging affirmance.

MR. JUSTICE JACKSON delivered the opinion of the Court.

This is a direct appeal by the Interstate Commerce Commission, whose orders the District Court of New Jersey has set aside, and by the Hudson & Manhattan Railroad

Company, whose rates are subject to the enjoined orders. Respondents are the City of Jersey City and the Price Administrator, who intervened under powers duly delegated to him pursuant to the Emergency Price Control Act of 1942[1] and the Inflation Control or Stabilization Act of 1942.[2]

The Hudson & Manhattan Railroad Company owns about 8.5 miles of electric railway, of which all but 0.63 mile is underground. It has two double-track lines, one of which, known as the "uptown line," connects Hoboken, New Jersey, with Christopher Street, New York, by two parallel tunnels under the Hudson River, and runs uptown under Sixth Avenue from Christopher Street to a terminal at 33rd Street. The other line, known as the "downtown line," crosses under the river by two parallel tunnels between Exchange Place, Jersey City, and Hudson Terminal, New York. It also extends westwardly in Jersey City to Journal Square, where connection is made with the Pennsylvania Railroad. The uptown and downtown lines are connected on the New Jersey side by means of a line paralleling the Hudson River. In conjunction with the Pennsylvania Railroad the Hudson & Manhattan operates a joint rapid-transit service between Hudson Terminal and Newark. It carries only passengers.

The present controversy has its roots in a rate case precipitated by the Company's effort to establish a 10-cent fare on its downtown line in 1937.[3] After full hear-

---

[1] Act of January 30, 1942, c. 26, 56 Stat. 23, 50 U. S. C. App., Supp. II, § 901 *et seq.*

[2] Act of October 2, 1942, c. 578, 56 Stat. 765, 50 U. S. C. App., Supp. II, § 961 *et seq.*

[3] Prior to 1920, the Hudson & Manhattan's rates had been 5 cents on the downtown line and 7 cents on the uptown line. In that year the railroad proposed a flat fare of 8 cents, but the Commission fixed the fares at 10 cents for the uptown line and 6 cents for the downtown line. Local Fares of Hudson & Manhattan Railroad Co., 58 I. C. C. 270. Those fares continued in effect until the 1937 proceedings began, when the railroad sought to make the fare 10 cents on both lines.

ings the Interstate Commerce Commission fixed an 8-cent fare effective July 25, 1938.[4] The 10-cent fare was denied chiefly on the ground that, while the Company might be entitled to the revenue, such a fare would decrease its patronage, and the Commission believed that an 8-cent fare would produce more revenue. Commissioners Miller and Mahaffie dissented from denial of the 10-cent fare on such grounds, holding it had been "amply justified" as "reasonable and lawful for the services performed." This Court held such grounds of denial to be sustained by evidence and to be within the Commission's discretion. *Hudson & Manhattan R. Co.* v. *United States,* 313 U. S. 98. The 8-cent fare remained in effect until the carrier on June 27, 1942 filed a petition in the same proceeding for further hearing, alleging changed conditions and increased costs in support of a 10-cent fare on the downtown line. Protests were filed by the City of Jersey City and the Hudson Bus Corporation. The Commission opened the proceeding and extensive hearings were held in September of 1942. Counsel for the Price Administrator appeared, stating that it was not his intention to offer evidence but that he reserved the right to make any motions and to file appropriate briefs. The hearings were concluded on September 19, 1942.

The Inflation Control Act of 1942, passed on October 2d, contained a proviso that "no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State or municipal authority having jurisdiction to consider such increase." § 1. Thereafter the Price Admin-

---

[4] 227 I. C. C. 741. The 10-cent fare on the uptown line continued in effect.

istrator [5] asked permission to and did file a brief opposing any increase in the rates. On January 25, 1943, the hearing examiner recommended that the Commission find the rate of 10 cents on the downtown lines to be just and reasonable. Exceptions were filed by Jersey City and the Price Administrator and argued by counsel for each, and on June 8, 1943 the Commission made its decision.[6] It reviewed the increases in operating costs since the 8-cent rate had been fixed and the need of the railroad for additional revenue "in order to meet increased operating expenses and the interest on its bonds." It increased the downtown fare from 8 cents to 9 cents, effective for duration of the war and six months thereafter, with permission to any of the parties to bring to the attention of the Commission additional facts if the revenue results should prove materially different from the Commission's estimate. The Commission's opinion considered the arguments of the Price Administrator against any increase, but said, "It seems to us that an increase of 1 cent in respondent's downtown fare is unlikely to have any inflationary effect, and that the effect thereof upon the cost of living, while a factor to be given consideration, will be so slight, a maximum of about 12 cents a week and 52 cents a month per passenger, as to be negligible. We believe, therefore, that the increased fare herein approved will not be in conflict with the Emergency Price Control Act of 1942, as amended." Three Commissioners dissented, holding that the Company had established its right to a 10-cent fare.

A month later the railroad filed a petition for reconsideration. Among other things, it alleged that it could

---

[5] By Executive Order No. 9250, 7 Fed. Reg. 7871, the President designated the Director of Economic Stabilization to receive notice of proposed rate increases pursuant to the statute. In the ensuing proceedings in this case the Director was represented by the Price Administrator.

[6] 255 I. C. C. 649.

not avail itself of the 9-cent rate because its fare collection boxes could not handle the volume of coins necessitated by the 9-cent rate and under war conditions could not be replaced. It asked to charge a 10-cent fare until it could secure tokens. Jersey City answered, asking that the petition be denied and the 9-cent fare suspended. The Price Administrator also answered. He advocated what he called a feasible scheme to collect the 9-cent fare through the use of paper tickets. The Price Administrator also asked that the fares go back to 8 cents in view of alleged increased earnings and asked that in any event before the fares were increased on the basis suggested by the Company a further hearing be held. On August 3, 1943 the Commission issued a report and order.[7] It found that it would be impossible to collect a 9-cent cash fare, and it authorized an alternative basis of eleven tokens for $1.00 or a cash fare of 10 cents, provided the same alternative basis be put into effect on the uptown line. This resulted, of course, in a rate of $9\frac{1}{11}$ cents to token purchasers on both lines.

Thereupon Jersey City filed a complaint in the District Court, asking that the Commission's order be enjoined "in so far as such order permits the establishment of any local interstate fare in excess of nine cents for transportation on the downtown line." It alleged that in authorizing downtown fares "in excess of the nine cent fare" fixed in the order of June 8, the Commission had deprived Jersey City of its full day in court by refusing it opportunity to cross-examine witnesses and present counter-evidence.

The Commission then reopened the proceeding on its own motion, but only "to permit any party hereto to present evidence directed solely to the propriety and lawfulness of the modifications made by the Commission in its report of August 3, 1943, on further consideration of its prior findings and orders of July 11, 1938 and June 8,

_____

[7] 256 I. C. C. 269.

1943" and to afford the right to cross-examine adverse witnesses. The Commission in its later report of November 2, 1943 referred to this reopening as being "out of an abundance of caution." At the reopened proceeding the Company offered testimony about the impracticability of collecting a 9-cent fare, and as to the earnings that would be derived from the proposed token and cash combination fares upon the assumption, supported by testimony, that 90 per cent of the passengers probably would purchase tokens. The examiner ruled that the basis of the 9-cent fare fixed by the order of June 8, 1943 was not in issue and confined evidence to the issues specified in the Commission's order. The Price Administrator offered a condensed income statement for the Hudson & Manhattan for the first seven months of 1943. The examiner declined to receive it, because it went only to the Company's need for revenue, an inquiry which was not reopened. The Price Administrator previously had submitted to the Commission a similar statement for five months of 1943, as part of its reply to the railroad's petition for modification of the 9-cent fare. The Commission in its report of August 3d rejected this statement as being without probative value. Neither of the statements showed the income of appellant from its railroad operations, but included income of the corporation from all operations, including the Hudson Terminal buildings in New York City and other real estate owned by it. The Price Administrator also petitioned the Commission for modificaton of the reopening order "in order that the said record be brought up to date." The purpose of this was stated to be to show that as a result of the war the earnings of the Company at an 8-cent fare for the full year 1943 would exceed the amount the Commission found adequate and reasonable in its 1938 order or in the order of June 8, 1943.

On November 2, 1943 the Commission issued its report and order, allowing a 10-cent cash fare or eleven tokens

for $1.00 as the rate on both the downtown and uptown lines. The Commission considered in its opinion the request of Jersey City and the Price Administrator that the limitations on the hearings should be removed and the whole rate case thrown open again. It pointed out that the complaint of Jersey City pending in the District Court did not question the propriety of the Commission's authorization of an increase in the downtown fare from 8 cents to 9 cents but challenged only the increase from 9 cents to $9\frac{1}{11}$ cents with tokens and 10 cents in cash. It considered the offer of proof made in the hearings and said: "Considering the contents of the motion now before us, and the offers of additional evidence made at the recent further hearing, we have no reason to believe that, if the additional hearing sought were held, we would feel warranted in modifying our findings as made in the second report. As will later appear, the alternative-fare basis herein approved can not be expected to yield materially better revenue results to respondent than we anticipated at the time of the second report. Accordingly, we see no sufficient reason for further reopening this proceeding at this time, and the motion will therefore be overruled." On the merits the Commission said:

"Upon the amplified record now before us, we find that the following basic facts, as underscored, have been established:

1. *It is impracticable for respondent to collect a cash fare of 9 cents.*

. . . . .

2. *There is available to respondent no practicable method of collecting a fare of, or approximating, 9 cents except by the use of tokens.*

. . . . .

3. *The use of tokens only for the local downtown traffic, while contemporaneously using cash fares for the other local traffic of respondent, is impracticable.*

. . . . .

*4. The use of an alternative-fare basis of 11 tokens for $1 or a cash fare of a dime for local interstate passengers on both the downtown and uptown lines is the only practicable method now available by which respondent can reasonably be expected to obtain the financial benefits contemplated by our findings and conclusions in the second report as necessary to insure adequate transportation service.*

. . . . .

*5. The modification of our prior findings as made in the third report of August 3, 1943, is not in conflict with the Emergency Price Control Act of 1942, as amended by the Stabilization Act.*

. . . . .

*6. A cash fare of 10 cents for the occasional or irregular passenger on the downtown line compares favorably with the reasonable charge made for similar service on railroads generally."*

On the basis of these findings the Commission authorized a fare of eleven tokens for $1.00 or a cash fare of 10 cents, payable by a dime, as reasonable and otherwise lawful for application during the war and for six months after its termination.

Jersey City thereupon amended its complaint pending in the District Court. It asked that the Commission's order of June 8, 1943, which established the 9-cent rate, as well as that of November 2, 1943, which modified it as stated, be enjoined, in so far as such order permitted any fare on appellant's downtown line in excess of 8 cents. The Price Administrator intervened, alleging that an increase over the 8-cent fare in effect on September 15, 1942 was in violation of the Stabilization Act. The United States was named as a defendant but filed a neutral answer because two government agencies were in opposition to each other. The Commission and the railroad answered. A statutory court of three judges was constituted and

an interlocutory injunction was granted November 26, 1943.

On January 12, 1944 a majority of the court below, one judge dissenting, held both of the Commission's orders invalid upon two grounds. It was of the view that the Commission had denied a full hearing in refusing to re-open the whole proceeding to receive evidence relating to the 1943 earnings of the carrier, and it held that the Commission had brushed aside too lightly the economic stabilization arguments of the Price Administrator. The effect of the District Court's order is to disallow not only the token and cash combination fare, but also the 9-cent fare which the Commission found just, reasonable and lawful, and to continue the 8-cent rate fixed in 1938 and held by the Commission to have become clearly inadequate to the rights and needs of the Company.

Each of the findings of fact by the Commission appears to be supported by substantial evidence. The court below has not found to the contrary, nor do we. Reasonable persons could no doubt differ as to whether it is probable that 90 per cent of the patrons will purchase tokens, whether the revenues of the lines will increase more than the operating costs, and as to various other features of the contest. But when this same railroad came to us complaining of such predicative findings we refused to review the weight of evidence and held that being supported by evidence the judgment of the Commission was final. *Hudson & Manhattan R. Co.* v. *United States,* 313 U. S. 98. Of course we cannot hold that the judgment of the Commission is less final merely because it has been exercised on this occasion for relief of the Company.

"Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a con-

vincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591, 602. The Commission considered that it had, and we find no reason to doubt that it had, the evidence before it that was needful to the discharge of its duty to the public and to the regulated railroad. "With that sort of evidence before them, rate experts of acknowledged ability and fairness, and each acting independently of the other, may not have reached identically the same conclusion. We do not know whether the results would have been approximately the same. For there is no possibility of solving the question as though it were a mathematical problem to which there could only be one correct answer. Still there was in this mass of facts that out of which experts could have named a rate. The law makes the Commission's finding on such facts conclusive." *Interstate Commerce Commission* v. *Union Pacific R. Co.,* 222 U. S. 541, 550.

"So long as there is warrant in the record for the judgment of the expert body it must stand. . . . 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.'" *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 145–46; *Mississippi Valley Barge Line Co.* v. *United States,* 292 U. S. 282, 286–87.

Unless, therefore, the court below is correct in holding that a fair hearing has been denied or in holding that the Commission misapprehended the effect of the emergency legislation, the order of the Commission is entitled to stand. We turn to those questions.

## I.

The District Court has set aside for want of fair hearing two orders of the Commission, one of which permitted an increase from 8 cents to 9 cents in the rate and the latter of which modified the 9-cent rate so far as to permit a $9\frac{1}{11}$-cent token rate and a 10-cent cash rate.

No claim is made that full hearing was denied as to the first order. The original complaint in this action, as we have pointed out, did not question the 9-cent rate order, but only the subsequent steps to modify it. The contention as to the first order is that the Commission in the circumstances was compelled to give a full rehearing before its order could become final. And it is urged that the order after the limited rehearing is invalid because there was a legal right to a wider range of inquiry before modification of the first order.

This raises an important but not a new question of administrative law. The Price Administrator's contention is that this record is "stale" and that a fresh record is important. One of the grounds of resistance to administrative orders throughout federal experience with the administrative process has been the claims of private litigants to be entitled to rehearings to bring the record up to date and meanwhile to stall the enforcement of the administrative order. Administrative consideration of evidence—particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it—always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the

discretion to be invoked was that of the body making the order, and not that of a reviewing body.

Only once in the history of administrative law has this Court reversed a Commission for refusing to grant a rehearing on the contention that the record was "stale." In *Atchison, T. & S. F. Ry. Co.* v. *United States,* 284 U. S. 248, this Court held that because of changed conditions the Interstate Commerce Commission abused its discretion in denying a rehearing. The record in that case was closed in September 1928. In February 1931, the railroads petitioned for rehearing and "pointed out the grave reductions, in traffic and earnings, from which they were suffering, that their net operating income for 1930 was over $100,000,000 less than their average annual net operating income for the five years preceding, and that their credit was seriously impaired. At the time of this petition, the order . . . had not yet become effective, but the Commission stood upon the record of 1928 and, without reopening the proceedings or taking further evidence, provided that its order should become effective on June 1, 1931." This, it was held, "was not within the permitted range of the Commission's discretion, but was a denial of right." 284 U. S. 248, 261–62.

The Court, however, promptly restricted that decision to its special facts, *United States* v. *Northern Pacific Ry. Co.,* 288 U. S. 490, and it stands virtually alone. In *Baltimore & Ohio R. Co.* v. *United States,* 298 U. S. 349, 389, Mr. Justice Brandeis, concurring, said, "The *Atchison* case rests upon its exceptional facts. It is apparently the only instance in which this Court has interfered with the exercise of the Commission's discretion in granting, or refusing, to reopen a hearing." *St. Joseph Stock Yards* v. *United States,* 298 U. S. 38, arose under the Packers and Stockyards Act. The Secretary of Agriculture was upheld in refusing to reopen the proceeding to take account of

changed conditions resulting from the economic legislation of Congress in 1933. Again, under the same Act, the Secretary of Agriculture denied a request to add three months' developments to the record, we refused to interfere, and the Court said, through MR. JUSTICE ROBERTS, "The amended petition was filed about three months after the original order issued. It is inconceivable that economic conditions had so altered in this brief period as to demonstrate that the new schedule of rates, if just when promulgated, had become unjust and oppressive. The schedule should have been given a trial and any alteration or modification should have been asked in the light of more extensive experience. We are unable to find anything arbitrary or unreasonable in the denial of the petitions." *Acker* v. *United States,* 298 U. S. 426, 433.

This Court has held that the Interstate Commerce Commission did not abuse its discretion in refusing a request for a new study as a basis for rate-making, although changes were alleged consisting of a falling off in volume of traffic, improvement of highways in the district resulting in diversion of traffic from rail to truck, decline in value of the articles transported, reduction in wages and cost of supplies, and curtailment of the amount of service rendered, and where the Commission decided that it was able on the record before it to consider the effect of the factors suggested by the appellants and that a new cost study was unnecessary. *Illinois Commerce Commission* v. *United States,* 292 U. S. 474, 480. Except that the trends are in an opposite direction, the inquiry demanded here is of the same nature. See also *Georgia Public Service Commission* v. *United States,* 283 U. S. 765, 769–70.

The Court has held that administrative tribunals "have power themselves to initiate inquiry, or, when their authority is invoked, to control the range of investigation in ascertaining what is to satisfy the requirements of the public interest in relation to the needs of vast regions and

sometimes the whole nation in the enjoyment of facilities for transportation, communication and other essential public services." *Federal Communications Commission* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 142. Cf. *American Bridge Co.* v. *Railroad Commission*, 307 U. S. 486, 494.

Nor can a litigant insist that a commission may not take a second step in a rate-making process without retracing all previous ones. As put by the CHIEF JUSTICE, "The establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other. The first is the adjustment of the general revenue level to the demands of a fair return. The second is the adjustment of a rate schedule conforming to that level so as to eliminate discriminations and unfairness from its details." Such procedure may be adopted where it is appropriate to carry out the provisions of an act. *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 584.

We have held that "The refusal to reconsider the issue of domination in the present unfair labor practice hearing accords, in our view, with the Board's discretionary powers." *Pittsburgh Glass Co.* v. *Labor Board*, 313 U. S. 146, 161.

We have rejected the plea of railroad stockholders that events subsequent to approval of a reorganization plan of a very similar character to those alleged here, require its return for reconsideration. *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523, 542–44; *Ecker* v. *Western Pacific R. Co.*, 318 U. S. 448, 506–09.

The rule that petitions for rehearings before administrative bodies are addressed to their own discretion is uniformly accepted and seems to be almost universally applied in other federal courts. *United States ex rel. Maine Potato Growers Assn.* v. *Interstate Commerce Commission*, 88 F. 2d 780, 784, cert. denied, 300 U. S. 684; *Mississippi Valley Barge Line Co.* v. *United States*, 4 F. Supp.

745, 748; *Union Stock Yards Co.* v. *United States,* 9 F. Supp. 864, 873; *American Commission Co.* v. *United States,* 11 F. Supp. 965, 972; *R. C. A. Communications* v. *United States,* 43 F. Supp. 851, 858.

*Central & South West Utilities Co.* v. *Securities & Exchange Commission,* 136 F. 2d 273, 275, involved an order of simplification under the holding company act, in which the petitioner moved for leave to adduce additional evidence. Denying the motion, the court said, "Petitioners show that their financial position has improved somewhat since the Commission held its hearings. Section 11 (b) authorizes the Commission to revoke or modify its order, after notice and hearing, in response to changed conditions, and there is no reason to assume that it will not do so if sufficient occasion arises. Nevertheless petitioners now ask leave, under Section 24 (a) of the Act, to adduce their improved position as 'additional evidence' in the completed hearings which led to the present order. We need not decide whether supervening events of this general sort may sometimes be 'additional evidence' within the meaning of Section 24 (a). If so, final administrative disposition and judicial review may often be prevented altogether by the mere fact that they take time." See also *Koppers United Co.* v. *Securities & Exchange Commission,* 138 F. 2d 577; *Colorado Radio Corp.* v. *Federal Communications Commission,* 118 F. 2d 24; *Red River Broadcasting Co.* v. *Federal Communications Commission,* 98 F. 2d 282, cert. denied, 305 U. S. 625.

Various objections to the Price Administrator's contention are made, such as that the evidence he proposed to offer was remote, or of no probative value, that the application to reopen did not conform to the Commission's rules, that he became, along with Jersey City, estopped from questioning the 9-cent fare by the original complaint in district court, which raised no issue about it, and that

the parties did not proceed with due diligence. We do not find it necessary to examine any of these contentions.

It is perfectly plain that unless the statutory authority of the Price Administrator gives him a different standing before administrative tribunals than can be claimed by private litigants there is no ground for holding that the denial of a rehearing constituted an abuse of discretion or amounted to unfairness which would invalidate the Commission's orders. The authorities referred to above make it abundantly plain that had the railroad's petition for rehearing been denied we would have held it to be in the sound discretion of the Commission and not reviewable. The rule of administrative law should not change because the shoe is on the other foot. There is no sufficient reason for breaking down our decisional rules that protect the administrative process against tactics to delay finality, unless Congress has so ordered us, as to which we next inquire.

## II.

The court below gave as a second reason for setting aside the two orders that the Commission "lightly brushed aside" the economic stabilization phase of the case and gave too little weight to the Price Administrator's contentions as to inflationary tendencies of rate increases. It said, and of course we agree, that the "Commission here is under a distinct duty in this particular case, to give full effect to wartime conditions and the stabilization legislation."

But that does not answer the real question, which is what is the effect of the stabilization legislation. In seeking this answer we are inquiring as to the relative powers and responsibilities of two federal agencies. Congress was free to apportion their functions as it saw fit and to transfer any part of the normal responsibility of the Commission to the Price Administrator or other executive agencies.

Commerce Commission authorization of rate increases could have been subjected to review or veto so far as any objection of the Commission is concerned.

But Congress did no such thing. The legislative history of relevant provisions of the Act was reviewed in *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144. It was there pointed out that Congress rejected a proposal that such rates should not be increased without consent of the President. On the other hand it was assured by executive representatives that rate advances already subject to scrutiny on behalf of the public and to proof of reasonableness were not the source of the more substantial inflationary threats. Congress then adopted the provision we earlier quoted.

In the light of such history this Court has been reluctant to construe the emergency legislation as giving the Administrator standing to make mandatory demands upon other tribunals or to strip them of their usual discretions. Under this statutory plan, as we have said in the language of MR. JUSTICE DOUGLAS, "The Administrator does not carry the sole burden of the war against inflation." *Hecht Co.* v. *Bowles,* 321 U. S. 321, 325, 331. At the same time, we said that the discretionary action of other tribunals, even of courts, "should reflect an acute awareness of the Congressional admonition that 'of all the consequences of war, except human slaughter, inflation is the most destructive' and that delay or indifference may be fatal."

No charge that the Commission ignored the Administrator's contentions can fairly be made on this record.[8] Al-

---

[8] The Commission has shown in other cases that it is watchful against inflation and charges itself with enforcing stabilization policy. See Increases in Texas Rates, Fares, and Charges, 253 I. C. C. 723, 734: "We are not unmindful of the evil effects of inflation, and, in our judgment, the inflationary tendencies of general increases in rates constitute a factor which we may and should take into consideration in passing judgment upon such increases. . . . Increases in the gen-

though he intervened in the original proceeding, first on his own behalf and then for the Stabilization Director, he made no effort to offer any evidence either before or after the hearing closed, despite the fact that nearly nine months elapsed between the close of the hearing and the Commission's order.[9] Nor did he even move for rehearing, until after the railroad had asked for modification of the order. He was then permitted to intervene, to file briefs and to be heard in argument, to cross-examine and to offer evidence. His desire to reopen the whole case was refused, because the Commission, considering all that he offered to show, said, "Considering the contents of the motion now before us, and the offers of additional evidence made at the recent further hearing, we have no reason to believe that, if the additional hearing sought were held, we would feel warranted in modifying our findings as made in the second report." And the Commission in its second report weighed the contentions of the Administrator and decided that they did not outweigh the needs for added revenue

---

eral price level ultimately affect the costs of rendering transportation service and the value of such service to the public. Such considerations were in fact carefully weighed and reflected in the increases which we authorized under Ex Parte No. 148." In Ex Parte No. 148, reported as Increased Railway Rates, Fares, and Charges, 1942, 248 I. C. C. 545, the railroads sought general increases of 10 per cent in freight and passenger rates. The Office of Price Administration appeared but took no position with respect to the general increase sought, and did not name the individual commodities with whose rates it professed to be particularly concerned. 248 I. C. C. at 571. Nevertheless the Commission apparently took careful note of "the effect upon the national defense of cumulated increases in production costs of manufactured products" and as to specific commodities, after consideration of the financial position of the affected railroads, denied or restricted the increases sought. 248 I. C. C. at 610.

[9] The Commission did have before it, however, traffic and gross revenue figures for the first two months of 1943, which were incorporated into the record by stipulation at the oral argument on April 20, 1943.

for the road. It said, "It seems to us that an increase of 1 cent in respondent's downtown fare is unlikely to have any inflationary effect, and that the effect thereof upon the cost of living, while a factor to be given consideration, will be so slight, a maximum of about 12 cents a week and 52 cents a month per passenger, as to be negligible." Considering this among other findings of fact it concluded to authorize the increased fare "to meet increased operating costs and the interest on its bonds."

That the weight to be given to stabilization considerations in relation to other factors calls for an exercise of judgment in any given case is not denied by the Administrator. Indeed in excepting to the examiner's report he said, "We did not nor do we now suggest that this proposed increase in fare [from 8 cents to 10 cents] will in and of itself result in inflation. Such a suggestion would, of course, be asinine." Who, then, in this case is to judge the weight to be given such a factor? The opinion of the Administrator is not, as we have pointed out, mandatory on the Commission. Nor is such an economic judgment the function of the courts unless all that has been established in administrative law concerning the limitation on judicial review is to be thrown overboard. The decision of such a matter by the Commission is clearly not reviewable by a court because it thinks differently of the weight that should be accorded to some factors in relation to others.

The Interstate Commerce Commission has responsibility for maintaining an adequate system of wartime transportation. It is without power to protect these essential transportation agencies from rising labor and material costs. It can decide only how such unavoidable costs shall be met. They can in whole or in part be charged to increased fares, or they can be allowed to result in defaults and receiverships and reorganizations, or they may be

offset by inadequate service or delayed maintenance. All of these considerations must be weighed by the Commission with wartime transportation needs as well as avoiding inflationary tendencies as a public responsibility. The need for informed, expert and unbiased judgment is apparent. The problem is intricate, the carrier is one of peculiar characteristics, its wartime traffic is of varying density, with peaks and rush hours, the rates and carrying capacities of competitors by bus and ferry are involved in any estimate of traffic diversions or probable effects of rates. What rates are required to meet actual and proper operating expenses, what revenue must be available to avoid defaults and sustain credit, what divisions should be made on interchanged traffic are as complex problems in rate-making as can readily be imagined. The delicacy of the Commission's task in wartime is no reason for allowing greater scope to judicial review than we are willing to exercise in peacetime. We think the weight to be given to the Price Administrator's contentions was for the Commission, not the court, to determine. The scope of proper judicial review does not expand or contract, depending on what party invokes it. It is as narrow now as it was when appealed to by the Company. Cf. *Hudson & Manhattan R. Co.* v. *United States,* 313 U. S. 98. If Congress desires to grant its own agencies greater privileges of judicial review than have been allowed to private parties it is at liberty to do so, but it is not for the Court to set aside, without legislative command, its slow-wrought general principles which protect the finality and integrity of decisions by administrative tribunals.

As to the contention that the Stabilization Act gave the Administrator standing superior to that of other litigants to ask the courts to override the normal discretion of the Commission in granting or refusing rehearings, we have already spoken in *Vinson* v. *Washington Gas Light Co.,*

321 U. S. 489. There, as here, the Stabilization Director insisted that he was "denied a fair hearing because the Commission refused in the current proceeding to alter and enlarge the scope of inquiry." There, as here, the controversy was "between two governmental agencies as to whether the powers of the one or the other are preponderant in the circumstances." Here, as there, we decline to invade the discretion of administrative tribunals to control their own rehearing procedure where the Congress has not given the Administrator standing superior to that of a litigant and has not divested the Commission of its ordinary discretions. The judgment below is

*Reversed.*

MR. JUSTICE RUTLEDGE dissents.

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS:

I would decide this case differently. I think this decision and *Vinson* v. *Washington Gas Light Co.,* 321 U. S. 489, pretty well emasculate the provision of the Act of October 2, 1942 (56 Stat. 765) which prohibits "any general increase" in utility rates unless notice is given to the federal agency in charge of inflation control and that agency is allowed to intervene in the proceedings. As I stated in my dissent in *Vinson* v. *Washington Gas Light Co., supra,* Congress intended by that provision that there should be as great an accommodation as possible between established standards for rate-making and existing wartime necessities. General rate increases were not to be allowed unless, for example, it was shown that they were necessary to preserve existing facilities under war conditions. I agree with Judge McLaughlin and Judge Meaney of the three-judge court that this emergency legislation

required the Commission "to give full effect to wartime conditions and the stabilization legislation." It was that policy which was reflected in Executive Order 9328 promulgated by the President on April 8, 1943 (8 Fed. Reg. 4681, 4682) and providing as follows:

"The attention of all agencies of the Federal Government, and of all State and municipal authorities, concerned with the rates of common carriers or other public utilities, is directed to the stabilization program of which this order is a part so that rate increases will be disapproved and rate reductions effected, consistently with the Act of October 2, 1942, and other applicable federal, state or municipal law, in order to keep down the cost of living and effectuate the purposes of the stabilization program."

That policy is once more disregarded. The Interstate Commerce Commission proceeds to grant rate increases on the basis of peacetime standards. It justifies the increase under the Act of October 2, 1942, by saying that the increase per consumer is negligible. By the same token every item in the list of consumer necessities could be increased a like percentage. What was negligible item by item would soon be substantial in the aggregate. That which first appears as a small trickle may eventually undermine the dam.

But though I disagree with the result reached, I think it is precisely what *Vinson* v. *Washington Gas Light Co.* intended. That case and *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144, give preferred treatment to a few businesses by allowing them to gain advantages from war conditions. I would overrule them. But so long as they stand I do not see how we can deny the Interstate Commerce Commission the power to do for the Hudson & Manhattan Railroad Co. what another commission was allowed to do for the Washington Gas Light Co.

MR. JUSTICE MURPHY joins in this opinion.