**GARDNER et al. v. UNITED STATES.**
Civ. A. No. 7350.

District Court, D. New Jersey.
July 12, 1946.

Collins & Corbin, of Jersey City, N. J., for plaintiffs.

Edgar H. Rossbach, U. S. Atty., of Newark, N. J., for the United States.

Daniel W. Knowlton, of Washington, D. C., for Interstate Commerce Commission.

Theo. McC. Marsh, of Newark, N. J., for Alden Coal Company et al.

Edward Dumbauld, Sp. Asst. to Atty. Gen., Daniel H. Kunkel, R. Granville Curry and Frederick M. Dolan, all of Washington, D. C., for intervening defendants.

Before O'CONNELL, Circuit Judge, and SMITH and MEANEY, District Judges.

O'CONNELL, Circuit Judge.

In this suit, various carriers ask to have set aside an order of the Interstate Commerce Commission which will result in a decrease of 25 cents per gross ton in the rates presently charged for hauling anthracite coal from the area of origin to the consuming area in and around New York City.[1] The proceedings before the Commission began in 1937 with the filing of a complaint by 41 principal producers and

---

[1] The rates in question apply to transportation from the mines located in the Wyoming, Lehigh and Schuylkill regions of Pennsylvania to destinations on the New Jersey shore of New York Harbor, called the Upper and Lower Piers, for transshipment. The rate to the Upper Piers is 5 cents higher than that for shipment to the Lower Piers. The rates include dumping of coal into boats, but no transportation over water. On October 10, 1945, the Commission handed down a report finding that "the assailed rates on anthracite from mines in the Wyoming, Lehigh, and Schuylkill anthracite regions of Pennsylvania to New Jersey tidewater points designated as the Upper Piers and Lower Piers are and for the future will be unjust and unreasonable to the extent that they exceed or may exceed rates of $2.25 per long ton on prepared sizes and $2.13 per long ton on pea and smaller sizes of anthracite to the Upper Piers and

shippers of anthracite. After full hearings, held from time to time, and in which the carriers participated, the Commission on October 11, 1943, issued a report dismissing the complaint and leaving the rates unchanged.[2] Later, the proceedings were reopened for reconsideration and rehearing, which was held. As a consequence, the Commission reversed its prior ruling and on October 10, 1945, issued the order which required the 25 cent per long ton reduction. On January 14, 1946, the carriers filed a petition for a further rehearing which was denied by the Commission.

We are urged to set aside the order on various grounds, but only two are sufficiently impressive as to merit extended discussion.

## I.

### Commission's Denial of Petition for Further Rehearing.

■ Plaintiff carriers concede that a petition for rehearing is addressed to the discretion of the Commission and not to that of the reviewing court. Interstate Commerce Commission v. Jersey City, 1944, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420. But, they contend, by January 14, 1946, conditions had so far changed from those existing in April 1944, date of the last hearing, that it was incumbent on the Commission to stay the effective date of its order and thus afford to the plaintiffs an opportunity of showing the new situation. The carriers maintain that the termination of hostilities caused a decline in traffic volume whereas railroad operating expenses were continuing to increase. Further, they argue that anthracite prices have increased since the date of the last hearing and the date of the Commission's order. In view of these factors, the carriers maintain that the denial of the petition for rehearing constituted an abuse of discretion within the doctrine of Atchison, Topeka & Santa Fe Railway Co. v. United States, 1932, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273.

At the hearing before us, we admitted evidence de novo by the carriers for the purpose of showing that a drastic change had thus occurred. But, we find nothing in the evidence presented, nor within the confines of the record itself, to warrant the conclusion that the change in conditions is so great as to bring about a new economic era. That the Atchison case, which dealt with the effect of the late great depression, is not loosely to be applied is apparent from United States v. Pierce Auto Freight Lines, 66 S.Ct. 687, 697, where Mr. Justice Rutledge, speaking for the Supreme Court, stated:

"The court rendered its decision on September 20, 1944, suggesting that the Commission had improperly denied the petition for rehearing. Its view was that the record was so stale, particularly in view of the influence of the war upon transportation facilities, that application of the doctrine of Atchison, Topeka & Santa Fe Ry. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273, was proper.

"That case, as has been indicated more than once, was 'promptly restricted * * * to its special facts, United States v. Northern Pac. R. Co., 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed. 914, and it stands virtually alone.' Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 515, 64 S.Ct. 1129, 1135,

---

rates of $2.20 per long ton on prepared sizes and $2.08 per long ton on pea and smaller sizes of anthracite to the Lower Piers." 263 I.C.C. at 656. An appropriate order was accordingly issued on October 10, 1945, effective on or before January 22, 1946, subject to the usual 30 days notice and posting period. On December 17, 1945, that order was modified as to become effective on February 21, 1946, upon like notice. On January 8, 1946, the order was further modified as to become effective May 22, 1946. The railroads' petition for rehearing was denied by order entered January 14, 1946. In this court, upon motion of the plaintiffs, we issued an interlocutory injunction enjoining the operation and enforcement of the order pending final determination of this suit with the proviso that in respect of anthracite shipments made on or after May 22, 1946, to which the rates prescribed in the order would be applicable but for the injunction, each of the plaintiff carriers shall keep correct records of the amounts received in excess of the rates prescribed in the Commission's order and such sums shall be held in trust, pending further order of the court. This opinion is dispositive of the entire issue.

[2] 256 I.C.C. 401.

88 L.Ed. 1420; see also Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 389, 56 S.Ct. 797, 817, 80 L.Ed. 1209. Except in the single instance, it has been held consistently that rehearing before administrative bodies are addressed to their own discretion. Interstate Commerce Commission v. Jersey City, supra. Only a showing of the clearest abuse of discretion could sustain an exception to that rule. The Commission was well acquainted with the impact of the war upon facilities for transport and upon the transportation business in general. In addition to its own expert knowledge concerning such matters, it had before it not only the facts set forth in the petition for rehearing but also those alleged in the extended replies filed by the applicants."

■ What Mr. Justice Rutledge there stated is here pertinent. In our opinion, the post-war period has not brought about such a drastic change in conditions as to warrant the application of the Atchison, Topeka and Santa Fe doctrine. Accordingly, we find no abuse of discretion in the Commission's denial of the petition for further rehearing.

## II.

### Constitutionality of the Commission's Order.

It is argued on behalf of the carriers that the Commission's order is violative of the due process clause. U.S.Constitution, Fifth Amendment.

Argument for the carriers maintains that the Commission's order was made without basic findings or upon findings made without evidence to support it and that its effect is confiscatory.

■ Before we turn to a consideration of these questions, we refer to certain applicable general principles as recently restated by the Supreme Court. In reviewing an order of the Interstate Commerce Commission, we must accord to it a presumption of validity. "Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It it the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." Federal Power Commission v. Hope Natural Gas Co., 1944, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333; see also, Interstate Commerce Commission v. Jersey City, supra, 322 U.S. at page 513, 64 S.Ct. at page 1134, 88 L.Ed. 1420: " 'So long as there is warrant in the record for the judgment of the expert body it must stand. * * * "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." ' Rochester Telephone Corporation v. United States, 307 U.S. 125, 145, 146, 59 S.Ct. 754, 764, 765, 83 L.Ed. 1147."

First. There was sufficient statement of basic findings to support the order.

■ The gist of the carriers' objection in this regard appears to be formal rather than substantive. We are urged to condemn the Commission's order on the assertion that the Commission failed to set forth certain basic findings as required by Section 15a.[3] We do not understand that the Commission is bound to use certain language in setting forth the reason for its conclusions. Nevertheless, a review of the Commission's Report dated October 10, 1945,[4] gives ample indication that the Commission considered all the factors requisite to the performance of its function. There is express comment upon the probable effect of the prescribed rates not only in regard to the movement of traffic, but also with regard to the financial needs of the carriers.

---

[3] 49 U.S.C.A. § 15a(2) provides: "In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service."

[4] 263 I.C.C. 639.

Indeed, after a comprehensive discussion of the anthracite industry, including rates applicable thereto and a cost study bearing directly upon the financial needs of the railroads, the Commission's conclusions included the following paragraph: "From the evidence before us, we are constrained to the belief that the post-war outlook for the industry, and necessarily also for those railroads that are largely dependent upon it (and this includes all but two of the defendants) is far from encouraging. Now, it seems to us, is the time, while both are enjoying a substantial but probably transient prosperity, to look ahead to the prospect of adversity and to take effective measures to cope with it. It is patent that the rate reductions here required will, alone, fall far short of that objective. Another and imperative requirement, upon which the future welfare and perhaps the very existence of the industry and the anthracite carriers depend, is that the cost of anthracite to the ultimate consumer be brought close to that of bituminous and far below that of oil and gas. Failing such a development the direction taken in the exercise of the functions with which we are charged will in the long run make little difference, either to the industry or the carriers. Nevertheless, a substantial rate reduction is an essential part in a broad program that must be evolved looking toward the permanent rehabilitation of the industry and its dependent railroads."

■ It seems to us that this was a sufficient setting out of basic findings. Cf. United States v. Pierce Auto Freight Lines, supra, 66 S.Ct. at page 696.

Second. There is sufficient warrant in the record to support the Commission's findings and order.

The report and order now under attack are the culmination of eight years of litigation before the Interstate Commerce Commission. A prior report [5] found that the old rates were not unreasonable. A petition for rehearing was granted and in 1944 the further hearing was held. The complaining carriers not only had the opportunity to be heard, but, indeed, participated actively throughout the litigation. Rates were carefully analyzed. The shippers presented a comprehensive study of costs to the carriers in transporting anthracite from the mines to tidewater terminals. The Commission's own Bureau of Transport Economics and Statistics then prepared an analysis of costs. At the rehearing in April 1944, the carriers submitted data referring to costs of transportation and analyzing rates. It is obvious that the Commission gave extremely careful consideration to the evidence thus submitted to it.

Comparisons were made with freight rates on bituminous coal. It was found that anthracite rates to the tidewater district were out of line. The Commission concluded, "In the circumstances set forth above it is clear that rates on anthracite from the origin territory to the tidewater piers should more nearly approximate the level of the rates on bituminous coal to those [Lake Erie] piers."

■ The Commission was justified in considering such a comparison as a factor in its rate making. Cf. Northern Pacific Railway Co. v. State of North Dakota, 1915, 236 U.S. 585, 599, 35 S.Ct. 429, 59 L.Ed. 735, L.R.A.1917F, 1148, Ann.Cas. 1916A, 1. The evidence before it amply indicated the competitive character of bituminous vis a vis anthracite. We find no error in the conclusion that an adjustment in anthracite rates to the tidewater is required to bring them in line with those applicable to bituminous.

■ We believe that the Commission applying proper criteria arrived at a correct conclusion which is amply supported by the evidence.

Third. The carriers have failed to prove that the rates set by the Commission are in fact confiscatory.

■ The argument on behalf of the carriers comes to this: Costs are increasing to such an extent that a reduction in anthracite rates as prescribed by the Commission will decrease revenue to the carriers to a point below actual costs of service. Evidence in support of this argument consisted of testimony by a railroad accountant who prepared various exhibits. The proof

---

[5] 256 I.C.C. 401.

consisted of average figures, on a system basis, and dealing with plaintiff carriers in the aggregate. On the other hand, plaintiffs are not helped by their analysis before us which, if accepted, would lead to the conclusion that the rates prescribed are confiscatory as to the two weakest lines involved (D. L. &. W. and Jersey Central). The government's answer is that even if an order is confiscatory of the property of two of the plaintiffs, there is no justification for condemning the order in toto. Cf. Ætna Insurance Co. v. Hyde, 1928, 275 U.S. 440, 447, 48 S.Ct. 174, 72 L.Ed. 357. Following plaintiffs' argument to its logical conclusion, we should strike down the Commission's order as to two of the competing carriers. But allowing these financially weaker lines to charge higher rates would hardly help them since a loss of traffic to stronger competitors would undoubtedly follow. Thus, the weaker railroads might be put in a worse position. In any event, we do not believe the carriers "have proved, with the degree of certainty required in cases such as this, that the enforcement of the Commission's order will operate to deprive them of their property without due process of law or to take its use for the service of the public without just compensation in contravention of the Fifth Amendment." Baltimore & O. R. Co. v. United States, 1936, 298 U.S. 349, 372, 56 S.Ct. 797, 809, 80 L.Ed. 1209.

At most, the carriers indicated a need for a general increase in rates for all commodities. The financial distress of the carriers should not be corrected by placing an unreasonable rate on a particular commodity. It may be that a new general rate structure applying to all commodities is indicated.[6] In the present posture of the case, however, we have no alternative but to uphold the Commission's order.

The plaintiffs' prayer for an injunction and other relief must be dismissed. Further, the Interlocutory Injunction issued by this court must be dissolved and the sums received by plaintiff carriers in excess of the rates prescribed in the Commission's order and which are now being held in trust, pursuant to the order of this court in said Interlocutory Injunction must be refunded to the proper parties entitled thereto. An appropriate order will be submitted to the court within fifteen days.

[6] Since the hearing before us, the Commission has authorized an interim general increase in freight rates, effective July 1, 1946. This includes an increase of 9 cents a gross ton for anthracite. See New York Times, June 22, 1946, pp. 1 and 17.