525 F.2d 1089
 TNT TARIFF AGENTS, INC. and National Carloading Corporation,
Petitioners,
v.
The INTERSTATE COMMERCE COMMISSION and United States of
America, Respondents,
and
Eastern Central Motor Carriers Association, Inc. and Rocky
Mountain Motor Tariff Bureau, Inc., Intervenors.
 No. 203, Docket 75--4052.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 6, 1975.
Decided Nov. 18, 1975.
 
 Elliott C. Winograd, New York City, for petitioners.
 
 
 1
 Thomas E. Kauper, Asst. Atty. Gen., Dept. of Justice (John H. D. Wigger, Atty., Dept. of Justice, Washington, D.C.), for respondent United States.
 
 
 2
 Lloyd John Osborn, I.C.C. (Fritz R. Kahn, Gen. Counsel, I.C.C., Washington, D.C.), for respondent Interstate Commerce Commission.
 
 
 3
 John R. Mahoney, New York City (Casey, Lane & Mittendorf, New York City), for Intervenor Eastern Central Motor Carriers Association, Inc.
 
 
 4
 John R. Mahoney, New York City (Casey, Lane & Mittendorf, New York City) and William E. Kenworthy, Denver, Colo., for Intervenor Rocky Mountain Motor Tariff Bureau, Inc.
 
 
 5
 Before WATERMAN, OAKES and MESKILL, Circuit Judges.
 
 WATERMAN, Circuit Judge:
 
 6
 Petitioners TNT Tariff Agents, Inc. (hereinafter 'TNT') and National Carloading Corporation (hereinafter 'National') seek to set aside orders of the Interstate Commerce Commission entered in two separate, but closely related, administrative proceedings. In I.C.C. Docket No. 35921,[1] the Commission found TNT's 'Tariff East' to be unjust and unreasonable. In IC.C. Docket No. 35921 (Sub-No. 1),[2] the Commission made the same finding with reference to TNT's 'Tariff West.'
 
 
 7
 National is a freight forwarder operating pursuant to Part IV of the Interstate Commerce Act. It provides freight transportation service from the point of receipt of a shipment to the final destination. Freight forwarder rates are set by the forwarders themselves, subject to disapproval by the Commission on the ground that they are unjust or unreasonable, or that they result in unjust discrimination or undue prejudice or preference. By schedules filed to become effective September 10, 1973, TNT published for National Items Nos. 619 and 80040 of TNT Tariff No. 14, ICC--FF No. 15 ('Tariff East') which amended their prior rates. The relevant part of those Items is reproduced in a footnote.[3] The effect of the Items was to reduce the forwarder's published full service rates by $1.00 per hundred pounds when customers' shipments were not picked up by the forwarder but were delivered directly to the forwarder's terminal. Apparently because TNT failed to properly symbolize the tariff change, neither of the intervenors here noticed the change in rate, and the tariff, not having been protested, went into effect unchallenged on September 10, 1972. Subsequently, however, when Intervenor Eastern Central Motor Carriers Association, Inc. (hereinafter 'Eastern') discovered the Items, properly symbolized, in an identical tariff published by Lifschultz Fast Freight, Inc., Eastern Requested the Commission to suspend the Lifschultz tariff and to investigate the TNT tariff.
 
 
 8
 The Commission responded to Eastern's protest by initiating of October 24, 1973 an investigation of the lawfulness of the TNT Items.[4] It was ordered that this investigation should be handled under the Commission's modified procedure rules, 49 C.F.R. § 1100.45, et seq., whereby all evidence is introduced in the form of affidavits, and cross-examination of witnesses is permitted only to resolve material factual disputes. TNT as respondent filed an opening statement of facts and arguments on November 9, 1973, in which it sought to characterize the $1.00 reduction when shipments were dock-delivered as a 'dock rate' rather than an 'allowance'; to show that the publication of dock rates is an established form of rate-making; and to demonstrate by a series of letters that numerous shippers favored TNT's tariff. While TNT presented no evidence of the actual cost to itself or shippers of performing the pickup service dock-delivery would do away with, it did assert that freight forwarder costs were 'skyrocketing' and that the newly published tariff was necessary to maintain the freight forwarder's competitive position.
 
 
 9
 Eastern's opening statement countered TNT's assertions with evidence that the cost in Eastern territory of performing pickup was less than $1.00 per hundred pounds on shipments of 500 pounds and heavier. Since the discount dock rate, or allowance, was not commensurate with the considerably smaller cost to the shipper of rendering the service of delivering his goods to the forwarder, Eastern argued that the tariff contravened the statutory mandate of Section 415 of the Interstate Commerce Act, 49 U.S.C. § 1015[5] and would exert a disruptive impact on the existing rate structure. TNT made a reply statement, but offered no additional evidence in its own behalf. Rather, it sought to discount the weight of Eastern's cost evidence on the ground that the evidence pertained only to motor common carriers' pickup costs and therefore was not probative of the reasonableness of freight forwarder's rates.
 
 
 10
 The initial decision of Administrative Law Judge Margulies, served on March 22, 1974, held that Eastern had established a prima facie case that Tariff East was unjust and unreasonable, that TNT had failed to rebut that case, and that the tariff must therefore be cancelled. On April 18, 1974, TNT filed exceptions to the decision, to which Eastern replied. By order served July 23, 1974, the Commission's Review Board No. 4 upheld the Judge's initial decision. On October 21, 1974, TNT filed a petition for a reconsideration of the case on the existing record, and also for a reopening of the proceeding for the purpose of receiving additional evidence. As part of its petition TNT tendered by way of an offer of proof a verified statement addressed to the motor carrier cost of picking up freight forwarder shipments and delivering them to freight forwarder docks. Eastern opposed the petition, in part on the ground that the new evidence was not timely offered. By order served January 31, 1975, TNT's petition was denied by the Commission, Division 2, acting as an Appellate Division.
 
 
 11
 Proceedings in No. 35921 (Sub-No. 1) regarding TNT's 'Tariff West' followed a similar administrative route. TNT had filed Tariff West Simultaneously with Tariff East as Item No. 52000 of Tariff No. 14, ICC--FF No. 15, to become effective on the same date. Except that it applies on the West coast, the wording and effect of Tariff West is identical to that of its eastern counterpart. Before the Commission, the Tariff West proceeding paralleled the Tariff East proceeding, except that it began and ended two months later than the latter, and the initial challenge to its fairness was made by the Rocky Mountain Motor Tariff Bureau, Inc. (hereinafter 'RMB'), rather than by Eastern. Administrative Law Judge Luttrell's initial decision of May 29, 1974, reached the same conclusion with reference to Tariff West as Judge Margulies had reached with reference to Tariff East. The holding that the tariffs in question were unjust and unreasonable was subsequently affirmed by Review Board No. 4, and ultimately, on March 6, 1975, by Division 2 of the Commission acting as an Appellate Division.
 
 
 12
 When TNT filed an amended petition for judicial review of the Commission's order regarding Tariff East, RMB moved to intervene in the Tariff East proceeding. The order was granted on May 20, 1975. The orders regarding Tariff East and Tariff West were voluntarily stayed by the Commission pending judicial review.
 
 
 13
 In support of its position that the Commission acted arbitrarily and capriciously, and that the orders rendered in both Tariff East and Tariff West were without substantial evidence to support them, TNT advances three major arguments. First, it contends that the Commission improperly allocated the burden of proof. Second, it asserts that the Commission's decision reflects a failure to distinguish between reduced dock rates and allowances to customers for the delivery of shipments to a forwarder's dock. Finally, it argues that the Commission erred in relying on the cost evidence proffered by Eastern and RMB as the basis for the Commission's finding that the tariffs are unjust and unreasonable. We find no merit in these contentions.
 
 
 14
 At the outset, we note the presumption of validity accorded to administrative bodies acting within their sphere of expertise. Interstate Commerce Comm. v. Jersey City, 322 U.S. 503, 512, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). Moreover, substantial discretion is accorded the Commission in weighing the factors determining just and reasonable rates. American Airlines, Inc. v. Civil Aeronautics Board, 161 U.S.App.D.C. 430, 495 F.2d 1010, 1017--18 (1974); United States ex rel. Maine Potato Growers & Shippers Ass'n v. Interstate Commerce Comm., 66 U.S.App.D.C. 398, 88 F.2d 780, 784 (1937), cert. denied, 300 U.S. 684, 57 S.Ct. 754, 81 L.Ed. 886 (1937). The Supreme Court has dictated that while a reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . ., the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).
 
 
 15
 With this background in mind, we turn to the first of petitioners' above arguments. We are satisfied that the Commission properly placed on Eastern and on RMB the burden of showing that the tariffs in question were unjust and unreasonable. Respondents concede that when the lawfulness of a published rate is challenged after the tariff has become effective, the burden rests on the complaining party (or the Commission). While Judge Margulies and Judge Luttrell nowhere explicitly stated to whom they had allocated the burden of proof, their decisions make clear that it was only after Eastern and RMB had each made out a prima facie case that it was unjust and unreasonable to grant $1.00 per hundred pounds to shippers when shippers delivered their shipments to a forwarder's facilities in lieu of the forwarder rendering pickup service, that the burden shifted to TNT to rebut that prima facie showing.
 
 
 16
 With reference to TNT's second contention that the Commission improperly characterized the tariffs as allowances rather than as dock rates, we are convinced that the tariffs were properly termed allowances, and that, in any case, the distinction is an entirely spurious one. TNT contends that an allowance is a discount from the regular fee given to the shipper in return for his assuming a duty normally rendered by the freight forwarder, but that a dock rate is a 'horse of a different color' and is the rate charged by the freight forwarder to compensate the shipper for the shipper's assumption of the pickup function. The distinction is important, TNT argues, because 49 U.S.C. § 1004(a), pertaining to freight forwarders' rates, provides only that they must be 'just and reasonable,' while 49 U.S.C. § 1015, pertaining to allowances, prescribes that they must not only be just and reasonable, but they must correspond to the value or cost of the shipper's performing the function.
 
 
 17
 Petitioners attempt to obfuscate the crucial point here: that the net effect of a reduced dock rate is identical with that of an allowance. The Commission has repeatedly regarded as immaterial whether the full rate is paid in the first instance and a portion of the amount so paid returned to the shipper as an allowance, or a reduced rate is paid in the first instance in the form of a lower dock rate. Its ruling in Freight Forwarder Allowances at Baltimore, Md., 315 I.C.C. 719 (1962) reflects the interchangeability of the terms. See also Lehigh Valley R.R. Co. v. United States, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839 (1917). The test to be employed in determining the reasonableness of either a reduced dock rate or an allowance is identical--it must be shown 'that (it) would be compensatory for the service to be performed thereunder.' 315 I.C.C. at 721. In assessing the lawfulness of reduced dock rates or allowances, the same inquiries are made and the same type of evidence is considered. The primary focus in both instances is upon whether the reduction in rate is commensurate with the reduction in the service required of the forwarder.
 
 
 18
 Turning to TNT's allegations that the Commission erred in relying on the cost data presented by Eastern and RMB, we find that such reliance was proper. The challenged evidence was based upon data prepared and published by the Commission in Cost Statement No. 2C1--71 'Cost of Transporting Freight by Class I and Class II Motor Common Carriers of General Commodities.' As the data applied to motor common carriers, TNT contends that it is not probative of the costs of forwarders.
 
 
 19
 TNT's assertions fail to take account of the overlapping functions of motor carriers and freight forwarders within the terminal areas or commercial zones. While motor carriers do perform some functions not also performed by forwarders, those functions are irrelevant to the instant inquiry, an inquiry which involves only the pickup function, an operation confined to the terminal area.[6] The pickup of freight may be provided to the same extent and in the same manner by both freight forwarders and motor carriers within that area. Thus, in agreeing to assume the pickup job in exchange for the reduced dock rate or allowance, the motor carrier would merely assume part of a function the forwarder is authorized to perform. The Commission therefore properly considered Eastern and RMB's evidence on the issue of the lawfulness of the tariffs.
 
 
 20
 Having confirmed the validity of its reliance on that data, we find little basis upon which TNT might challenge the Commission's findings that the tariffs were unreasonable. The standards by which the Commission determines the reasonableness of allowances were articulated in Allowances for Privately Owned Tank Cars, 258 I.C.C. 371, 378 (1944), and approved by the Supreme Court in El Dorado Oil Works v. United States, 328 U.S. 12, 18 n. 2, 66 S.Ct. 843, 90 L.Ed. 1053 (1946). The amount of the allowance (1) should not be more than is just and reasonable for the service or for the instrumentality furnished, and (2) should not exceed the reasonable cost to the owner of the goods of performing the service or of furnishing the instrumentality used. The lower of those sums marks the maximum by which the forwarder, in exchange for the shipper's performing of the pickup function, may reduce the shipper's costs.
 
 
 21
 Eastern and RMB demonstrated that the cost of pickup in their territories was less than $1.00 per hundredweight on all shipments of 500 pounds or more. Indeed the evidence indicates that the cost of pickup in cents per hundredweight sharply decreases as the size of the shipment increases, so that the average cost of pickup for a typical 5,000 pound shipment moving between New York and Los Angeles, California, is 33.3 cents per hundredweight.
 
 
 22
 The only cost evidence offered by TNT to counter the RMB and Eastern data was a verified statement belatedly produced, produced almost three months after the decisions of the Administrative Law Judges had been affirmed by the Commission's Review Board. Parenthetically it should be noted that this verified statement was based upon the same Commission cost data concerning motor carriers which RMB and Eastern had utilized in the preparation of their economic statements. This fact lends further credence, of course, to our conclusion that the evidence of motor carrier costs was properly considered by the Commission. The Commission's Division 2, upon consideration of the records, and the petitions and replies, denied TNT's requests for reconsideration and for a reopening 'for the reason that sufficient grounds (had) not been presented to warrant granting the action sought.' In support of its petition, TNT had offered no explanation for its delay in introducing the verified statement. In the absence of any clear error in judgment on the part of the Commission, and in view of TNT's failure to comply with one of the Commission's General Rules of Practice, 49 C.F.R. § 1100.101(b), which requires that in a petition for rehearing the proponent must explain why the new evidence sought to be offered was not previously adduced, we find no error in the Commission's denial of TNT's petition.
 
 
 23
 Thus, having before them no contrary data from TNT, the Administrative Law Judges quite properly relied upon the evidence introduced by Eastern and RMB as proof that the tariffs were unjust and unreasonable. As they acted within their statutory authority in receiving and considering that evidence, and as they rested their decisions upon adequate findings supported by that evidence, we find no merit to petitioners' allegation that the decisions were unsupported by substantial evidence in the record. 'So long as there is warrant in the record for the judgment of the expert body it must stand. . . . 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Rochester Telephone Corp. v. United States, 307 U.S. 125, 145--46, 59 S.Ct. 754, 764, 83 L.Ed. 1147 (1939); Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286--87, 54 S.Ct. 692, 78 L.Ed. 1260 (1934).
 
 
 24
 Petitioners' only remaining assertions are that the Commission's order was too broad and that the cancellation of the tariffs should apply only to shipments weighing more than 500 pounds, and should be cancelled only in those regions serviced by the protestants Eastern and RMB. With reference to the geographical objections, it is to be noted that while indeed it was Eastern and RMB who originally complained of the tariffs, the Commission itself instituted these proceedings by an order served October 24, 1973. The Commission was therefore not restricted to reviewing the validity of the tariffs only in the areas within which RMB and Eastern operate. As the Commission was concerned not only with the effect of the tariffs in the territories serviced by protestants, but also with the disruptive and unfair impact the rates would have on competitive practices nationally, we find that the Judges properly exercised their discretion in finding the tariffs to be unreasonable in their entirety once they were shown to be unreasonable in part. Similarly, while there may be portions of the tariffs as published that are sustainable for weights under 500 pounds, the Administrative Law Judges were entitled to find the entire tariffs to be unreasonable, for the issue before them was not whether by coincidence portions of the tariffs could be defended, but rather whether each tariff as a whole met section 415 standards.
 
 
 25
 Petition denied.
 
 
 
 [1]
 Entitled 'Allowance for Delivery of Shipments to Forwarder Facilities.'
 
 
 [2]
 Entitled as in Footnote 1 supra
 
 
 [3]
 Item No. 619 reads:
 'SHIPMENTS DELIVERED TO FORWARDER
 Rates, charges and provisions which do not include pickup service will apply only when shipments are delivered directly to Forwarder's facility. Shipments which are delivered to Forwarder's Agents will not be considered to be delivered to the Forwarder and will not be subject to rates, charges and other provisions which do not include pickup service.
 Except as otherwise provided, where tariffs making reference to this tariff do not provide LTL rates applicable when no pickup service is afforded, the rates in the applicable tariffs making reference to this tariff will be subject to the provisions of Column D of Note 1 or in the absence of specific provisions or Column D the rates will apply less one dollar per hundred pounds. Where provisions are made in tariffs making reference hereto for rates which do not include pickup service, such rates will not apply except at New York, N.Y. on shipments under 500 pounds they will apply, and in lieu thereof the rates which do include pickup service will apply and be subject to Column D of Note 1 herein or in the absence of specific provisions or Column D, the rates which include pickup service less one dollar per hundred pounds will apply.'
 Item 80040 of the same tariff is identical to Item 619 except in the second paragraph of 80040 the abbreviation LTL is omitted.
 
 
 [4]
 The investigation of the Lifschultz tariff, docket no. 8894, embraced docket no. 35921, the Tariff East investigation
 
 
 [5]
 § 1015. Allowances to shippers for transportation service
 If the owner of property transported in service subject to this chapter directly or indirectly renders any service connected therewith, or furnishes any instrumentality used therein, the charge and the allowance therefor, to such owner, shall be published in tariffs filed in the manner provided in this chapter and shall be no more than is just and reasonable and the Commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the freight forwarder or forwarders for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order. (Emphasis added).
 
 
 [6]
 Indeed, as respondents point out, TNT could not lawfully offer an allowance to shippers for delivery to the forwarder's facilities from points outside the terminal area, for that is a transportation service which the forwarder is not obligated to, and may not lawfully, perform. An allowance may be paid only for services which the carrier must ordinarily provide and is relieved from providing. United States v. Baltimore & Ohio R.R. Co., 231 U.S. 274, 34 S.Ct. 75, 58 L.Ed. 218 (1913)