**CARTWRIGHT VAN LINES, INC.,**
**Plaintiff,**

v.

**UNITED STATES of America**
**and**

**Interstate Commerce Commission,**
**Defendants,**

**and**

**United Van Lines, Inc., et al.,**
**Intervening Defendants.**

**No. 20376–1.**

United States District Court,
W. D. Missouri, W. D.

Nov. 9, 1973.

---

H. G. Homme, Jr., Washington, D. C., John H. D. Wigger, Dept. of Justice, Washington, D. C., Bert C. Hurn, U. S. Dist. Atty., Kansas City, Mo., for defendants.

Frank W. Taylor, Jr., Lowell L. Knipmeyer, Knipmeyer, McCann & Millett, Kansas City, Mo., F. Neil Aschemeyer, Rebman & Aschemeyer, St. Louis, Mo., Warren N. Grossman, Knapp, Gill, Hibbert & Stevens, Los Angeles, Cal., for plaintiff.

Before GIBSON, Circuit Judge, and COLLINSON and OLIVER, District Judges.

JOHN W. OLIVER, District Judge.

### MEMORANDUM AND ORDER

This is an action to set aside an order of the Interstate Commerce Commission entered on November 8, 1971, in its Docket No. MC–88368 (Sub.No.20), denying Cartwright Van Lines, Inc.'s application of May 9, 1968, for a certificate of public convenience and necessity authorizing operation as a common carrier by motor vehicle over irregular routes, of household goods between Earp, California, and a 50-mile radius, and points in California. Cartwright Van Lines, Inc., Extension–California, 114 M.C.C. 303 (1971).

Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325, and 5 U.S.C. § 1009.

The material facts are not in dispute. The facts found by the hearing examiner were adopted by the subsequent appellate bodies and plaintiffs do not dispute that they were reliably found. We incorporate these findings by reference and attach them to this memorandum and order as Appendix A. There is no necessity, therefore, of restating the factual circumstances except as may be necessary to discuss the legal questions presented.

Plaintiff filed its application for a certificate of public convenience and necessity on May 9, 1968, after its interchange agreement with Martin Van Lines at Earp, California, by which plaintiff was able to operate to points in California via a southern route, was terminated because of Martin's bankruptcy.

Cartwright had previously applied for and received, on April 4, 1968, temporary authority to conduct operations in the transportation of household goods between Earp, California and points within a 50-mile radius on one hand and points in California on the other.

After initially setting the application for hearing under a modified procedure, which contemplated the submission of the case on a stipulated record, the application was referred to Joint Board No. 47 for issuance of a recommended report and order and was then finally assigned to a hearing examiner for disposition. After oral hearings, the hearing examiner, on May 26, 1970, entered his report and recommended order recommending that the certificate be granted. Exceptions to the report were filed by protestants Bekins Van Lines Co., Lyon Van Lines, Inc., Aero Mayflower Transit Company, Inc., United Van Lines, Inc., Allied Van Lines, Inc., and North American Van Lines, Inc., and the proceeding was reopened for consideration. On October 26, 1970, Review Board No. 3 sustained the hearing examiner's report and conclusions.

Upon reconsideration, Division I of the Commission, acting as an Appellate Division, reversed the findings and conclusions of the Review Board and denied Cartwright's application. Cartwright then filed a petition for reconsideration which was denied by Division 1, acting as an Appellate Division, on April 7, 1972.

On May 1, 1972, Cartwright filed a petition to declare this proceeding a matter of general transportation importance. That petition was denied on May 8, 1972, by the entire Commission.

■ Cartwright then filed this Action on June 8, 1972. United Van Lines, Inc., Bekins Van Lines Co., and Lyon Van Lines, Inc., protestants before the Commission, intervened. On June 13, 1972, this case was found to be a case which, under 28 U.S.C.A. §§ 2284 and 2325, is required to be heard and determined by a District Court of three judges.

Plaintiff in his complaint prayed for a temporary restraining order. That relief was not granted.

Oral argument was waived by the parties and the case was submitted to the Court after written briefs were filed on behalf of all the parties.

Plaintiff contends that the Commission acted "capriciously and arbitrary [sic] in applying principles enunciated in Burnham Van Service, Inc. Household Goods, 13 States, 98 M.C.C. 48." Burnham, aff'd sub nom. United Van Lines, Inc. v. United States, 266 F.Supp. 586 (E.D.Mo.1967); and other cases, most notably T. E. K. Van Lines, Inc., Common Carrier Application, 86 M.C.C. 139, aff'd sub nom. Aero-Mayflower Transit Co. v. United States 208 F.Supp. 303 (S.D.Cal.1962), have held that specific standards will be applied when an interline agreement, in which several independent carriers of household goods "tack" their various authorities to operate on an interstate basis, is disrupted by the termination of the agreement by one of the participants. When such a disruption occurs the Commission will grant additional operating authority to a participant without the proof of public need ordinarily required in order that all the traffic previously carried pursuant to the interline agreement will not be lost to the participants. The standards that the Commission has established to deal with these situations are that the carrier must show (1) that the former interline agreement was terminated through no fault of its own; (2) that it has made reasonable efforts to negotiate a new agreement and has been unable to do so; (3) that the public made substantial use of the interline agreement prior to its disruption; and (4) that the loss of such traffic would have a serious adverse effect on the affected carrier.

The Commission in this case applied those standards and denied Cartwright's application because it found that Cart-

wright had failed to satisfy the last three criteria listed above.

With reference to the first criteria, plaintiff's only attempt to obtain a new interline agreement, the hearing examiner found, consisted of a telegram to a number of carriers dispatched at 12:02 p. m., February 14, 1968, which read:

WE WOULD LIKE TO NEGOTIATE AN INTERLINE INTERCHANGE AGREEMENT BETWEEN POINTS IN CALIFORNIA INTERSTATE. IF WE DO NOT HEAR FROM YOU BY 2:30 p. m. CENTRAL STANDARD TIME, WE WILL KNOW YOU ARE NOT INTERESTED.

Plaintiff argues that the intent of the telegram was to seek an indication of whether other carriers were interested in negotiating a new interline agreement and that a speedy response was required so that in-transit shipments would not be interrupted. The Commission found otherwise:

Applicant's attempts to replace this service, however, have been minimal. Such efforts consisted only of a telegram to certain carriers worded in the most general terms and, considering the need for transmission time within the telegraph company itself, allowing little or no time for affirmative replies. We do not believe applicant has sufficiently satisfied the first criteria set forth above. [114 M.C.C. at 307–308].

The Commission also concluded that Cartwright failed to show that there had been a substantial use of the interline agreement. Cartwright offered only Exhibit 8, which is a lengthy computer print-out containing thousands of shipments which, according to the testimony of William F. Cartwright, Cartwright's president, contained all of the following types of shipments: (1) shipments that moved between points in California and points east of California, traversing the Parker-Earp gateway; (2) shipments that neither originated in nor were destined for California but which passed through the Parker-Earp gateway; and

(3) shipments that originated in or were destined for California but did not traverse the Parker-Earp gateway. (Tr. 87–88). No other evidence to clarify Exhibit 8 was submitted and Mr. Cartwright admitted that there was no way, without underlying documents, not in evidence, to determine how many of the shipments included in that exhibit were shipped by way of the Martin interline agreement.

The Commission considered the evidence and concluded:

With respect to applicant's traffic patterns while interline operations with Martin were in effect, applicant presented evidence showing only its total tonnage to and from California points and that most of this traffic was military in nature. It does not indicate, however, what portion of the above traffic moved over the Earp gateway as opposed to movements over applicant's northern routes and any attempt on our part to ascertain such traffic figures from this record would be purely speculative. [footnote omitted]. Thus, although the hearing examiner found that revenues derived from traffic moving over the Earp gateway in 1969 (under applicant's temporary authority) constituted 36.1 percent of applicant's total operating profit, we do not have before us information which would disclose the amount of traffic actually transported over the Earp gateway while interline operations with Martin were in effect. Nor did applicant disclose what proportion of its total revenues such interline traffic would have represented. [114 M.C.C. at 308–309].

In its brief the plaintiff cites various figures concerning the traffic which it alleges Exhibit 8 shows passed over the Parker-Earp gateway. There is. no explanation in the brief of how these figures are derived. Apparently, however, the figures were compiled through the use of certain abstracts which Cartwright filed as appendices to its petition for reconsideration of the Division

I order denying its application, which it filed on January 10, 1972.

The mere fact that these appendices were introduced in the Commission record at that late stage in the proceedings, however, does not show that the Commission acted arbitrarily and capriciously in denying plaintiff's application. The Commission evidently did not find the information contained in those documents conclusive and we may not substitute our own judgment for that of the Commission under the circumstances. We can well understand, after reviewing those documents, how the Commission might have concluded that the appendices were confusing and inconclusive, and that their introduction at that advanced stage of the proceedings gave it no opportunity to develop fully and precisely the meaning of the information presented therein and to check its accuracy.

■ One other matter should be noted in this connection. Plaintiff, in its reply brief, states that the operating witness indicated that a substantial portion of the shipments prior to the granting of the temporary authority moved over the Parker-Earp gateway and that "[t]his evidence is in the record in sufficient strength and quantity to justify the appropriate finding." Plaintiff, of course, misses the point. The question is not whether there was evidence that would support a contrary finding by the Commission, but whether there was substantial evidence to support the finding that the Commission did make.

■ Finally, evidence of traffic after the granting of temporary authority need not be given great weight by the Commission:

Although it has been generally established that temporary authority may be used to support a permanent application as an indication of the volume of traffic involved [footnote omitted], reliance upon traffic generated under temporary authority in a case such as this is, in our opinion, inappropriate. As shown previously, the main thrust of the *Burnham* rationale is that a need for continued service may be established by evidence of *substantial joint-line use* on the part of the public for a number of years. The traffic transported by applicant in 1969 under temporary authority moved in a single-line service and has not been shown to be representative of applicant's traffic patterns while interline operations with Martin were in effect. We do not believe that applicant should be permitted to support its case primarily upon traffic patterns which might well have been established subsequent to the termination of the interline arrangements here in question. [114 M.C.C. at 309]. (Emphasis in original).

With respect to the fourth criteria in the *Burnham* test, the Commission found that the plaintiff had not shown that the loss of traffic through the Earp-Parker gateway would have a serious adverse effect on the company. That finding was made first because of the lack of any evidence to support the contrary conclusion. Plaintiff cites the testimony of its treasurer, Mr. Tom Cartwright, who stated that denial of the certificate would have "an almost final effect on the company" (Tr. 20); and that the Company would have incurred a substantial deficit in 1969 had it not been able to ship to California via the Parker-Earp gateway (Tr. 30), as supporting its position. The only support for those statements, however, were speculative deductions based upon income derived from shipments pursuant to Cartwright's temporary authority. The Commission was not remiss in not finding such evidence conclusive.

Furthermore, since Cartwright failed to show how much of its California traffic moved through the Parker-Earp gateway, "it would be speculative to conclude that a denial would result in a loss in traffic." [114 M.C.C. at 309]. The Commission concluded:

In sum, we do not have before us on this record any convincing evidence to support a finding that the interline traffic handled by applicant and Mar-

tin was, in fact, substantial, nor that the loss of such traffic would have a serious adverse effect upon applicant's overall operations. [114 M.C.C. at 309].

In reviewing orders of the Commission this Court does not sit as a court of first impression. An order will not be set aside if it is supported by findings which are not arbitrary or capricious but are adequately supported by substantial evidence on the record as a whole. See United States v. Dixie Highway Express, Inc., 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967), and United Van Lines, Inc. v. United States et al., 266 F.Supp. 586 (E.D.Mo.1967). "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Aero-Mayflower Transit Company, Inc. v. United States et al., 208 F.Supp. 303, 306 (S.D.Cal.1962), citing with approval Miss. Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934). In addition, an order of the Commission is presumed valid and plaintiff has the burden of establishing that the order was unsupported by substantial evidence. See Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420 (1949).

We find and conclude that the plaintiff has not satisfied that burden. It has not been shown that the Commission departed from precedents established in *Burnham, supra,* and *T.E.K. Van Lines, supra,* in denying the certificate under the circumstances. But even if it had departed from precedent, United Van Lines, Inc. v. United States, *supra,* which affirmed *Burnham, supra,* points out that that would not be a reason for this court to annul the Commission's order. This Court is not to weigh the consistency or inconsistency of the Commission's orders. Our only function is to decide whether or not the evidence presented will support the conclusions actually reached by the Commission.

We find and conclude that plaintiff has not shown that there was insuffi-

cient evidence to support the Commission's conclusion. Rather, we conclude that there was ample evidence to support those conclusions.

For the reasons indicated, it is

Ordered (1) that the order of the Interstate Commerce Commission, Division No. I, entered on November 18, 1971, should be and is hereby affirmed. It is further

Ordered (2) that the order of the Interstate Commerce Commission, Division No. I, entered on April 17, 1972, should be and is hereby affirmed.

## APPENDIX A

### Examiner's statement of facts

Applicant is a motor common carrier operating principally in the transportation of household goods. Held authorities enabled it to operate in 46 of the continental United States. However, it can serve only a few described points and areas in a number of the States in which it operates. Much of its held authority is radial in character and is between relatively small base points, on the one hand, and, on the other, points or described points and areas in named States. Under held authorities, applicant can operate in the transportation of household goods between points in described Northwestern States and California. It can also serve Parker, Ariz., and points within 25 miles. By taking held authorities it can now operate in the transportation of household goods between points in California and points it serves in Eastern States. However, such traffic cannot, under held permanent authorities, be transported over southern routes nor over any route considered feasible by applicant in single-line operations.

In July 1964, applicant entered into an interchange agreement with certain other carriers. Although this interchange agreement is not limited to the handling of California traffic, applicant states that considerable California traffic was handled under it. Applicant has agents in California that solicit traffic it de-

sires to handle. One of the parties to the referred-to agreement was Martin Van Lines. Martin's held authorities, and operations it conducted under the interchange agreement enabled the traffic to move through Earp, Calif. In operations in the handling of eastbound traffic for California, under the interchange agreement, the traffic was originated by Martin Van Lines and it handled the traffic to Earp where it was interlined with applicant for movement across the California-Arizona border to Parker, Ariz. At Parker, it was interlined with Bruce and Sons Van & Storage Co., which handled the traffic to some eastern point it served that was also served by applicant, such as Amarillo, Tex., and it would then be interlined with applicant for movement to final destination. Interline operations were conducted by applicant and the other carriers that were parties to the interchange agreement until February 13, 1968, when Martin Van Lines canceled the agreement. Martin Van Lines is now in receivership. Upon cancellation of the referred-to interchange agreement, applicant sent telegrams to a number of motor common carriers of household goods that had authority for operations between Arizona and California in which it sought to make other interline arrangements for the handling of California traffic similar to the arrangement that had been canceled by Martin Van Lines. Telegrams were sent to Dean Van Lines, Republic Van Lines, Bekins Van Lines, Lyon Van Lines, and Aero Mayflower. As noted, some of these carriers are parties to this proceeding. However, applicant has been unable to work out any interline agreement to replace the one it had with Martin Van Lines. On April 4, 1968, applicant was granted temporary authority to conduct operations in the transportation of household goods from Earp, Calif., and points within 50 miles thereof, to points in California, and from points in California to Earp and points within 50 miles. On brief, certain of protestants urge that applicant made no good faith attempt to work out an interchange agreement with other carriers. However, protestants did not indicate at the hearing, nor any time prior thereto, that they would enter into such an agreement and there is no evidence to refute applicant's contention that such service is not now available. The examiner concludes that the evidence establishes that applicant is presently unable to enter into a satisfactory agreement so as to continue the operation it conducted under the referred-to interchange agreement.

A grant of this application will enable applicant to perform that part of the service in the handling of California traffic that was formerly performed by Martin Van Lines, one of its interchange carriers, in addition to that part of the operation it formerly conducted under the interchange agreement. Earp, Calif., is on the California-Arizona border and the 50-mile radius described in the application extends into Arizona. Interchange operations with Bruce and Sons Van & Storage Co., under which it would handle the traffic from Earp, and points within 50 miles, to eastern points served by applicant, will be continued.

Applicant has several affiliated companies, including Cartwright Moving & Storage, Inc., Cartwright Movers of Washington, Inc., and Cartwright International Van Lines, Inc., all of which are wholly owned subsidiaries. Applicant presently has pending before the Commission, in No. MC–F–10651, an application for approval and its purchase of authorities held by Judith McKeever. The Bureau of Enforcement of the Commission has filed a notice of its intention to protest approval of the referred-to application on the issue of applicant's fitness. A prior application of Cartwright Van Lines, Inc., for the acquisition by it of control of Judith L. McKeever in No. MC–F–10106, was denied by the Commission's Review Board No. 5 on January 14, 1969.

Applicant operates a substantial amount of suitable equipment to handle this type traffic, including tractors, trailers, and straight trucks. Its trailers include both vans and flat-bed units.

The proposed operation would be performed with existing equipment, which applicant states is not now used to full capacity. Applicant states that much of its equipment has been used in connection with the handling of California traffic that moved under the Martin interchange agreement and that a denial of the application would result in its having no use for a large part of its existing equipment and that its loss of revenue would so endanger its operations and make them so unprofitable that it would probably be necessary for it to discontinue operations as a motor common carrier. As of August 31, 1969, applicant had total assets of $1,211,179 and a net worth of $304,125. On the same date, its current assets were $569,501 and current liabilities $497,070. Its net income for the first 8 months of 1969 was $55,638. For the same period in 1968, it was $37,902. Applicant conducts operations pursuant, to a safety program designed to effect compliance with applicable safety rules and regulations.

Applicant's traffic studies reflect that it handled 3,871 California shipments, of which 171 either originated at or were destined to a point in Arizona; 673 shipments, weighing 2,081,679 pounds, were commercial traffic and the remainder, having a total weight of 11,997,075 pounds, were handled for the military. In February, March, and April 1968, 87 shipments moved through the Earp gateway and 234 did not. During the following 4 months, 533 moved through Earp and 168 did not. During the first 8 months, 533 moved through Earp and 168 did not. During the first 8 months of 1969, applicant handled 1,196 shipments, weighing 4,188,653 pounds. All but one moved through the Earp gateway. Of these shipments, 292, weighing 731,903 pounds, were commercial and 904, weighing 3,456,750 pounds were military. Two of the shipments were of traffic destined to Earp or points within 50 miles of Earp. Applicant's records reflect that approximately 36.1 percent of its operating profit is derived from operations performed in part under the referred-to temporary authority.

The application is supported by Bruce and Sons Van & Storage Co., one of the parties to the referred-to interchange agreement. Bruce's headquarters are at Amarillo, Tex., and it holds authorities enabling it to conduct operations in approximately 10 States, but it cannot serve California. However, Bruce actively solicits this type of traffic moving to and from California and participates in its movement principally between Parker, Ariz., and eastern points it serves. The traffic, formerly handled under the referred-to agreement, is presently handled under the same agreement, but with Cartwright replacing the Martin service with operations it conducts under its temporary authority. Bruce participated in the handling of approximately 50 California shipments in 1969. It handled no California traffic between the time of the cancellation of the referred-to interchange agreement by Martin Van Lines and the time when applicant received its temporary authority. Bruce asserts that cancellation of the interchange agreement caused it to lose local traffic in addition to that moving from and to California. Bruce will continue to interline traffic with applicant if the application is granted.

Whitney Transfer Co., Inc., is a motor common carrier of household goods holding authority for operations in approximately 28 States, principally east of the Mississippi River. It was not a party to the referred-to interchange agreement, but has handled California traffic with applicant in operations applicant conducted pursuant to that agreement. Approximately 25 shipments were so handled during the past year. Whitney has 44 booking agents and it regularly solicits California traffic. It states that a denial of this application would cause it to lose approximately $25,000 a year in gross operating revenues.

Garden Grove Transfer & Storage Co., Golden Bear Van Lines, and Clairmont Transfer & Storage Co., Garden Grove, Calif., conduct joint operations in the

transportation of household goods. All hold intrastate authority in California and act as agents for applicant in soliciting interstate traffic. The three companies handled approximately 400 shipments under their agency agreement with Cartwright in 1969. They assert that a denial of this application would not only prevent them from soliciting interstate traffic but that it would also adversely affect local traffic they now handle. They will use applicant's service in its operations with other carriers if the application is granted.

Del Reye Van & Storage, Hawthorne, Calif., is a local California carrier that also acts as an agent for applicant in soliciting and booking household goods traffic moving from and to California. It has acted as such an agent since approximately 1965. During the past year it participated in the handling of approximately 100 shipments, of which 43 were commercial-type traffic and 57 military. Prior to entering into the agency relationship with applicant, Del Reye was an agent for Security Van Lines, another household goods carrier. That agency agreement was terminated by Security and for a period of approximately 6 months shipper was unable to complete a satisfactory arrangement with any other carrier and was unable to assist its customers in the handling of traffic moving from and to California. It knows of no carrier, other than applicant, with which it could, make satisfactory arrangements to handle the interstate traffic of its customers. It also fears that loss of its agency relationship to handle interstate traffic will adversely affect storage service it now performs. Some of the shipments booked for applicant by Del Reye have actually moved by other carriers through northern California, but most moved through the Earp gateway and were handled by applicant under the referred-to interchange agreement.

Englewood Moving & Truck Rental Co., Denver, Colo., is also an agent for applicant, pursuant to which it solicits California traffic. In 1969, it handled approximately 75 such shipments, of which approximately one-half were commercial and one-half military. It states that a denial of the application would adversely affect its solicitation of traffic moving from and to points in southern California. It considers applicant's service, under held temporary authority, to be satisfactory and it will continue to use applicant's service if the authority here sought is granted.

North State Storage Co., Inc., Jacksonville, N. C., AAA Storage Co., Fayetteville, N. C., and Empire Storage Co., Havelock, N. C., are commonly controlled local carriers of household goods and act as agents for applicant in soliciting and booking interstate household goods traffic. They have acted as such agents for approximately 8 years. In 1969 they handled 11 shipments to California, most of which were for military personnel at Camp Lejeune, N. C. Although two other carriers are represented, these booking agents consider applicant's service to be superior to the other two and they will continue to use it if the authority here sought is granted.

North Central Van Lines, Lincoln, Nebr., is a local agent for applicant. It has 15 agents in the Nebraska area. It has been an agent for applicant for approximately 12 years and conducts a similar service to that of North State Storage Co. It will continue to use applicant's service if the authority here sought is granted.

Cartwright Moving & Storage, Inc., Kansas City, Mo., one of applicant's affiliated companies, acts as applicant's agent for both military and commercial household goods traffic in the Kansas City area. In 1969, it participated in the handling of 37 commercial shipments to and from California that had a total weight of 253,300 pounds, and 23 military shipments, weighing 80,600 pounds. This subsidiary of applicant states that its agency relationship with the parent company enables it to successfully operate in the transportation of local traffic as well as to assist its customers in the handling of household goods traffic moving from and to California.

Hudgel Transfer Co., Inc. (now Adobe Van & Storage, Inc.), is a local agent for applicant in Phoenix. Adobe is also a certificated carrier of household goods in Arizona. It has used applicant's service in the handling of California traffic. One of the shipments of household goods from California moved to a destination at Parker, Ariz. Adobe will continue to use applicant's service if the authority here sought is granted.

U. S. Van Lines, Inc., Atlanta, Ga., holds extensive authority for operation in the transportation of household goods and conducts operations in all States except New Mexico, Nevada, Alaska, and Hawaii. It asserts a need for an interline carrier between Arizona, on the one hand, and, on the other, points in California, and it would enter into an agreement with applicant for such interline operations if the authority here sought is granted. It has sought similar interline arrangements with other carriers, but has been unsuccessful in negotiating satisfactory arrangements. To the extent referred to, it will use applicant's service if the authority sought is granted.

Yellow Freight System, Inc., Kansas City, Mo., is a motor common carrier operating in the transportation of general commodities. It stations employees at several points in California, and when employees are transferred, it acts as the shipper of their household goods. However, it is not equipped to handle this traffic in its own operations. Applicant handled 13 shipments, aggregating approximately 93,000 pounds, that moved to points in California, in 1969. Applicant's revenue from this shipper's traffic was approximately $5,800. Shipper will continue to use applicant's service if the authority here sought is granted.

Marion Laboratories, Kansas City, Mo., is a manufacturer and distributor of pharmaceutical products. It has sales personnel throughout the United States, including California, and it is the shipper of their household goods when they are transferred. Applicant is its principal carrier in the handling of this traffic. In 1969, applicant handled 24 ship-

ments of a total weight of 210,920 pounds and for which shipper paid applicant $14,885. Four shipments handled were either from or to points in California. It considers applicant's service to be satisfactory and, subject to a grant of authority here sought, will continue to use it.

Katz Drug Co., Inc., Kansas City, Mo., operates a chain of drug stores. It has employees in California and is the shipper of employees' household goods when employees are transferred from and to points in California. In 1969, applicant handled 35 shipments for employees of this shipper. Applicant's service was satisfactory and will be used on a continuing basis if the authority here sought is granted.

Cartwright Movers of Washington, Inc., another of applicant's wholly owned subsidiaries, handles all of the overseas operations for applicant. Cartwright presently owns approximately 1,500 containers used in the handling of overseas household goods traffic. Cartwright also books shipments that move between California and points in the Eastern States. It believes that a denial of the application would adversely affect the service it offers shippers in the handling of both interstate and foreign traffic. Approximately 60 percent of the traffic it would tender to applicant is military traffic and 40 percent is commercial.

### PROTESTANTS

Protestants presented no oral testimony at the hearing. As noted, the parties stipulated that, subject only to cross-examination by protestants of applicant's witnesses, all verified statements submitted prior to the hearing should be considered as part of the record and that it would not be necessary that the persons who made such statements for protestants appear as witnesses. The evidence so submitted establishes that all protestants hold extensive authorities for operations as motor common carriers in the transportation of household goods. Each can and does serve either all points in the United States or points in most States. They conduct nationwide efforts

to obtain traffic as well as local solicitations through agents and other representatives. They operate large fleets of equipment and have terminals and other facilities throughout the United States that are used in the handling of this type traffic. Their investments in both equipment and other facilities are substantial. No specific complaints are made as to the service they render. They consider the handling of household goods traffic moving from and to California to be important to their operations and indicate that they are ready, willing and able to handle additional traffic. They urge that no need has here been shown for a grant of authority to applicant and contend they will be harmed by applicant's operations if granted the authority it seeks. They also urge that a grant of authority to serve a restricted territory may not be based on evidence relying exclusively upon a need for long-line service that can only be performed through tacking the authority sought with held authority and interlining with other carriers.