685 F.2d 624
 222 U.S.App.D.C. 174, 13 Envtl. L. Rep. 20,223
 MOBIL OIL CORPORATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Chicago and North Western Transportation Company, et al.,
State of Texas, Western Fuels Association, Inc., Burlington
Northern Railroad Company, Union Pacific Railroad Company,
Sunoco Energy Development Company, Intervenors.
WYOBRASKA LANDOWNERS ASSOCIATION, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Union Pacific Railroad Company, Chicago and North Western
Transportation Co., State of Texas, Sunoco Energy
Development Company, Intervenors.
 Nos. 81-2037, 81-2038.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 24, 1982.
Decided July 22, 1982.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Bruce J. Terris, Washington, D. C., with whom Nathalie V. Black, Washington, D. C., was on the brief, for Wyobraska Landowners Ass'n, et al., petitioners in No. 81-2038.
 David Sutherland, Washington, D. C., with whom Everett Hutchinson and Richard G. Lepley, Washington, D. C., were on the brief, for Mobil Oil Corp., petitioner in No. 81-2037.
 John J. McCarthy, Jr., Atty., I. C. C., Washington, D. C., with whom Robert S. Burk, Acting General Counsel, Kenneth P. Kolson, John J. Powers, III and Barry Grossman, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents. Ellen K. Schall, Atty., I. C. C., Washington, D. C., also entered an appearance for respondent I. C. C.
 Fritz R. Kahn, Washington, D. C., with whom Thomas E. Acey, Jr., John Osborn, Washington, D. C., and Christopher A. Mills, Chicago, Ill., were on the brief, for Chicago and North Western Transp. Co., et al., intervenors in Nos. 81-2037 and 81-2038.
 Mark White, Atty. Gen., State of Texas, Austin, Tex., for State of Texas, intervenor in Nos. 81-2037 and 81-2038.
 Dennis G. Lyons and Richard S. Ewing, Washington, D. C., were on the briefs, for Sunoco Energy Development Co., intervenor in Nos. 81-2037 and 81-2038.
 Robert B. Batchelder, Omaha, Neb., was on the brief for Union Pacific R. R. Co., intervenor in Nos. 81-2037 and 81-2038.
 Curtis H. Berg, St. Paul, Minn., Charles H. White, Jr. and Steven A. Lauer, Washington, D. C., were on the brief, for Burlington Northern R. R. Co., intervenor in No. 81-2037.
 Edward Weinberg and Charles F. Holum, Washington, D. C., were on the brief, for Western Fuels Ass'n, Inc., intervenor in No. 81-2037.
 Before TAMM, MacKINNON and ROBB, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MacKINNON.
 MacKINNON, Circuit Judge:
 
 
 1
 Two railroads, the Burlington Northern, Inc. (Burlington) and the Chicago and North Western Transportation Company (North Western), were authorized jointly in a 1976 decision (1976 Decision) of the Interstate Commerce Commission (the Commission) to construct and operate a "joint line" of track from the southern terminus of Burlington's track at Coal Creek Junction, Wyoming, south of Gillette, to a point about 100 miles further south to connect with the North Western's existing east-west line at Shawnee, Wyoming and the Burlington line in the same vicinity.[1] The purpose was to enable both railroads to transport coal from recently developed mines in the fabulous coal-producing regions of the Powder River Basin (the Basin) in Wyoming.
 
 
 2
 The North Western originally intended to transport such coal over its east-west line from Shawnee. It subsequently determined, however, that its track, roadbed and bridges were incapable of handling the anticipated coal traffic which would be much heavier and greater in volume than existing traffic. North Western thus proposed an additional plan to rehabilitate its line from Shawnee to a point about 50 miles east at Van Tassell, Wyoming, and from there to construct a new "connector line" 56 miles south to connect with the line of the Union Pacific Railroad Company (Union Pacific) at Joyce Station, Nebraska. This would permit the North Western to carry coal for over 100 miles via the joint line and an additional 100 miles eastward and south via Van Tassell to the junction with the Union Pacific at Joyce Station.
 
 
 3
 In a decision in 1981 (1981 Decision) the Commission (1) approved North Western's application to construct the "connector line," (2) refused to reopen the 1976 Decision, and (3) approved a "Joint Line Agreement" between the Burlington and North Western to govern operations of the joint line.[2]
 
 
 4
 These two decisions by the Commission have led to two petitions which are here consolidated. First, Mobil Oil Corporation, the petitioner in No. 81-2037, and intervenor Western Fuels Association, Inc. (jointly referred to hereinafter as "Mobil"), primarily challenge the Commission's refusal to reopen the 1976 Decision. Mobil owns and is developing a coal mine located beyond the northern terminus of the joint line which means that its mine is presently served by a single railway, Burlington. Mobil urges that North Western be given trackage rights over Burlington's existing line north of Coal Creek Junction to provide competitive rail service above the northern terminus of the joint line.
 
 
 5
 The petitioners in No. 81-2038 are the Wyobraska Landowners Association and Finley Company (jointly referred to hereinafter as "Wyobraska"), landowners whose land and ranching operations will be affected by the construction of the connector line that the Commission has approved. The landowners have raised a number of procedural and environmental arguments in an effort to thwart the construction of the proposed connector line.
 
 
 6
 We disagree with the arguments advanced by the petitioners in both proceedings. We hold that the Commission's refusal to reopen its earlier proceedings on the joint line did not constitute an abuse of discretion. We further hold that there is substantial evidence in the record to support the Commission's approval of the construction of the connector line and of the Joint Line Agreement.I. Background
 
 
 7
 Burlington in October 1972 filed an application with the Commission, seeking authority to construct a 126-mile line to connect its two existing east-west lines in Wyoming, one of which is located in the northern part of the Powder River Basin and the other to the south thereof. 1981 Decision, supra at 910. In May 1973, North Western sought Commission authority to build a 76-mile line that would extend north from its existing east-west line which runs south of the Basin. Id. The Commission was reluctant to authorize two new lines that would roughly parallel each other and strongly encouraged the two railroad companies to submit a proposal for a joint line. The two railroads subsequently submitted a joint proposal and in January 1976, the Commission authorized the joint construction and ownership of a single line.[3] The Commission's decision expressly provided that Burlington would solely own and operate a nine mile stretch of track located between the northern terminus of the joint line at Coal Creek Junction and the southern tip of the pre-existing Burlington Gillette Branch at Amax Junction. 1976 Decision, supra at 389. See accompanying map. Mobil's coal mine is located adjacent to this nine mile line.
 
 
 8
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 9
 While the Commission was still considering the construction application, the two carriers in May of 1975 executed a "Joint Line Agreement" to implement the joint project. The Agreement provided that each would pay half the cost of the construction. Id. at 393. North Western did not seek Commission approval of the Joint Line Agreement until June 1979. At the time of the 1976 Decision, which approved only construction of the joint line, the source of financing for North Western's portion of the cost was unknown. Id. at 395, 402, 406. Nevertheless, the Commission did not withhold its approval of the joint application because it believed that the anticipated heavy use of the railway to carry Basin coal would result in a highly profitable operation, id. at 401-02, and could be easily financed. Furthermore, the Commission assumed that it would have opportunity later to pass upon North Western's financing arrangements if securities were to be issued. Id.
 
 
 10
 It subsequently developed that the North Western was unable to obtain financing to pay its share of the construction costs but Burlington went ahead anyway and built the joint line, except the North Western's spur from Shawnee Junction to Shawnee, at its own expense. See Verified Statement of Louis T. Duerinck, p. 23, in North Western's Petition for Order to Show Cause Why Terms of Joint Line Agreement, Except as Previously Modified by the Commission, Should Not Now be Prescribed. On June 1, 1976 Burlington agreed to extend the payment deadline for North Western until November 30, 1977. North Western failed to meet that deadline and on January 1, 1978 the carriers negotiated a "Second Supplemental Agreement," granting North Western an additional two years in which to pay its share of costs, estimated at about $60 million. This supplemental agreement also provided that North Western would be deemed to have withdrawn from the joint project in the event it failed to pay by November 30, 1979. 1981 Decision, supra at 911.
 
 
 11
 In August 1978, North Western and one of its subsidiaries filed for financial assistance from the Federal Railroad Administration. Id. North Western sought the funds to pay its share of the joint line costs and to finance the rehabilitation and upgrading to coal handling capacity of its already existing east-west line (the Fremont Line). The railway administration was not satisfied with North Western's proposal and suggested that the carrier explore other alternatives.
 
 
 12
 North Western's financial difficulties prevented it from properly maintaining its Fremont Line which extends from the joint line eastward 519 miles to Fremont, Nebraska. North Western had intended to use this line for the transport of coal obtained from mines along the joint line. The necessary upgrading along the 519-mile Fremont Line would have required the replacement of all ties and rail together with the strengthening or replacing of 417 bridges. Faced with the cost of that prospect, North Western proposed to rehabilitate only a portion of the Fremont Line and to build a 56 mile connecting line (the connector line) between its line at Van Tassell, Wyoming and Union Pacific's line at Joyce Station, Nebraska. 1981 Decision, supra at 911. Union Pacific's line meets North Western's line at Fremont, Nebraska and Council Bluffs, Iowa, thereby delivering considerable traffic to the Union Pacific, and permitting the possible return of some traffic in coal to the North Western east of Fremont. Under North Western's present plan a subsidairy of Union Pacific Corporation, parent of Union Pacific, will provide the initial financing for the connector line, which will allow North Western to build up its capital, meet its obligations on the joint line and permit it to defray the cost of rehabilitating that portion of the Fremont Line between the joint line and the connector line. On May 22, 1981, North Western withdrew its application for Federal Railroad Administration funding, having arranged in the interim for private financing. Id. at 912.
 
 
 13
 Prior to the Commission's 1981 Decision, Burlington took the position that North Western, pursuant to the terms of the Joint Line Agreement and the accompanying supplemental agreements extending the payment deadline, had forfeited its right to participate in the joint line. As the November 30, 1979 deadline for payment of North Western's share of the joint line approached, North Western petitioned the Commission to issue an interlocutory order postponing that deadline. 1981 Decision, supra at 912. On November 30, 1979, the Commission denied the requested extension but made clear that the two carriers could not by private agreement, in the absence of Commission approval, convert the 1976 authorization for joint carrier construction and operation into a single carrier project (J.A. Vol. I, 1-8). The Commission emphasized that North Western's participation in the joint line would continue unless the Commission subsequently determined that its participation was no longer required by the public convenience and necessity. Id. at Vol. I, 6. Burlington proceeded to pay the entire cost of completing the so-called "joint line" and has been operating it alone since then. North Western has never paid its share of the construction costs for the joint line.
 
 
 14
 On October 7, 1980, an administrative law judge approved both the construction of the proposed connector line and the Joint Line Agreement between the railroads-the latter subject to certain conditions.[4] He subsequently approved four related transactions designed to facilitate execution of the connector line proposal. 1981 Decision, supra at 910, 941-45.
 
 
 15
 In July 1981 the Commission affirmed the finding of the administrative law judge that the public convenience and necessity allowed North Western's construction and operation of the proposed 56-mile connector line. 1981 Decision, supra at 925-26. In addition, the Commission approved the Joint Line Agreement between Burlington and North Western as well as the four ancillary transactions. The Commission also dismissed North Western's earlier application to issue securities because the railway had changed from federal to private financing.
 
 
 16
 The Burlington was the principal challenger before the Commission to the administrative law judge's approval of both the Joint Line Agreement and the construction of the connector line.[5] In this appeal, however, the Burlington is not opposing the Commission's approval of either the Joint Line Agreement or of the construction of the connector line. The sole remaining opposition to the connector line came from Wyobraska which argued before the Commission that construction approval should be denied on environmental grounds. Wyobraska contended that (1) the administrative law judge (ALJ) did not adequately consider other alternatives to the construction of the connector line and (2) that his initial decision failed to comply with the requirements of section 7 of the Endangered Species Act, 16 U.S.C. §§ 1531-1543 (Supp. IV, 1980).
 
 
 17
 In its petition to this court for review of the Commission's 1981 Decision, Wyobraska expanded its objections to include the arguments (3) that the Commission relied upon unrealistic traffic volume projections, (4) that it allowed North Western to improperly segment its proposal, and (5) that it relied on an inadequate environmental impact statement.
 
 
 18
 Before the Commission, Mobil contested the refusal of the ALJ to authorize North Western to operate on Burlington track to the north of the Coal Creek Junction northern terminus of the joint line. They reassert their position here, claiming that the Commission ruled contrary to the public interest by refusing to reopen the 1976 Decision.
 
 
 19
 On March 17, 1980, the Commission denied Mobil's first petition to reopen the 1976 Decision which, if granted, would have required Burlington to give North Western trackage rights on Burlington's nine mile rail segment north of the joint line. Mobil later filed another petition to reopen, claiming that the Commission's adverse ruling on the 1976 Decision did not establish competitive equality throughout the entire Powder River Basin. The Commission denied this second petition on November 13, 1980, stating that the agreement line construction proceedings were not the appropriate forum in which to raise the question whether additional carriers should be authorized to operate along the nine mile segment. (J.A. Vol. I, 107.) The Commission invited Mobil to submit evidence showing antitrust violations or other illegal activities. Id. Mobil filed additional evidence. 1981 Decision, supra at 922. The Commission's 1981 Decision discussed Mobil's evidence in support of its allegations and found it insufficient to require reopening of the 1976 Decision. Id. at 922-24.
 
 
 20
 The petition for review that Mobil filed with this court in No. 81-2037 sought review of both the Commission's 1981 Decision and its 1976 Decision. The Commission subsequently moved to dismiss the portion of the petition that sought review of the 1976 Decision. On December 10, 1981, a motions panel of this court granted the motion to dismiss that part of the petition to review the 1976 Decision without prejudice to Mobil's claim that the Commission erred in refusing to reopen or modify the 1976 Decision.
 
 II. SCOPE OF REVIEW
 
 21
 Our review of the Commission's decision to approve the connector line proposal must comply with the Administrative Procedure Act,[6] which limits our role solely to a review of the Commission's action, and does not permit us to consider the matter anew or substitute our judgment for theirs. This principle, according to Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 499, 88 S.Ct. 602, 608-609, 19 L.Ed.2d 723 (1968), is especially true when applied to Commission findings relating to the public interest:
 
 
 22
 Determination of the factors relevant to the public interest is entrusted by the law primarily to the Commission, subject to the standards of the governing statute. The judicial task is to determine whether the Commission has proceeded in accordance with the law and whether its findings and conclusions accord with the statutory standards and are supported by substantial evidence.
 
 
 23
 These standards place a heavy burden upon the petitioners in attempting to establish that the Commission's decision is arbitrary or unsupported by substantial evidence.
 
 
 24
 Also at issue in this case is the Commission's decision to deny Mobil's petition to reopen the 1976 Decision. It is well settled that petitions for rehearing are addressed to the sound discretion of the Commission and that courts will intercede only upon a showing of the clearest abuse of discretion. United States v. Pierce Auto Lines, Inc., 327 U.S. 515, 535, 66 S.Ct. 687, 697, 90 L.Ed. 821 (1946). We stated in RSR Corporation v. Federal Trade Commission, 656 F.2d 718, 721 (D.C.Cir.1981), that "(b)oth the Supreme Court and this court consistently have subscribed to the rule that administrative agencies are not to be required to reopen their final orders 'except in the most extraordinary circumstances.' " (footnote omitted). The rationale underlying this rule was articulated by the Supreme Court in Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 514-15, 64 S.Ct. 1129, 1134-1135, 88 L.Ed. 1420 (1944):
 
 
 25
 If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body.
 
 
 26
 Where as here the agency has taken final action on a matter that is peculiarily within its realm of expertise, we will not require the agency to reopen its proceedings except upon a clear showing of abuse of discretion or of extraordinary circumstances.
 
 
 27
 III. The Commission's Refusal to Reopen the 1976 Decision
 
 
 28
 We begin with No. 81-2037 and Mobil's contention that the Commission erred in denying its petition to reopen the 1976 Decision. Mobil advances two arguments for reopening. First, Mobil claims that the Commission abdicated its duty under 49 U.S.C.A. § 11344(b)(1), (2) (1982 Supp.)[7] to consider the benefits to the public interest resulting from competition, by refusing to condition its approval of the joint line on the providing of competitive service along the nine mile segment above the northern terminus of the joint line.[8] Brief of Mobil Oil Corporation Petitioner at 21-22. Second, Mobil claims that the Burlington coerced North Western not to serve points north of the northern terminus. Id. at 24-26.
 
 
 29
 A. Competitive Rail Service Above the Northern Terminus of the Joint Line
 
 
 30
 The Commission concluded that neither of Mobil's arguments constituted the "material error, new evidence, or substantially changed circumstances," 49 U.S.C. § 10327(g) (Supp. III, 1979), necessary to justify reopening the 1976 Decision. 1981 Decision, supra at 925. The Commission reasoned that its 1976 Decision fully served the public interest because it authorized competitive service along the entire joint line. Id. at 923. North Western's original application never proposed to serve territory north of Coal Creek Junction. Id. at 922. The Commission merely approved the agreement of the Burlington and the North Western to form the joint line according to the overlapping portions of their original applications. Id. at 923-25. We find nothing irrational about the Commission's decision to permit the two railroads to construct the joint line between the points where it connects with their own trackage. The Commission also referred to the ALJ's conclusion that Burlington was entitled to benefit from having already constructed a line extending south from Gillette. 1981 Decision, supra at 922. We agree with the Commission that Burlington and North Western have no affirmative duty, under either antitrust laws or the Interstate Commerce Act, to agree to jointly serve the entire Powder River Basin. Id. at 925. Such decision are within its normal jurisdiction. Finally, the Commission was reluctant to impose conditions on Burlington that were unrelated to the approval of the Joint Line Agreement. It therefore refused to condition its approval of the Joint Line Agreement on a requirement that the Burlington expand North Western's operating rights beyond that of the joint line. Id. at 923.[9]
 
 
 31
 B. Burlington's Alleged Coercion of the North Western
 
 
 32
 On the second claim of coercion, we find no reason to disturb the Commission's determination that Mobil's evidence did not sustain its allegation that Burlington had coerced North Western to accept Coal Creek Junction as the northern terminus of the joint line. The Commission found that Mobil's evidence of alleged coercion consisted mainly of memoranda and testimony relating to meetings held between Burlington and North Western in 1973 and 1974. The Commission reviewed the history of events leading to approval of the joint line proposal and observed that it, i.e., the Commission, had suggested that the two carriers meet to consider a joint application.[10] If the parties were going to submit a joint line proposal, some joint meetings were required. The meeting was held on December 5, 1973. Commission representatives were present at part of the meeting and after it was agreed to submit a joint application, termini for the joint line were tentatively determined. Id. at 924.
 
 
 33
 The Commission also found no suggestion in the record that Burlington and North Western had held any negotiations concerning the location or length of their lines before their submission of separate applications. Id. at 925. Finally, the Commission received persuasive evidence from the carriers that the "secret agreement" cited by Mobil was nothing more than an antitrust settlement agreement filed with the federal district court in Wyoming by the carriers and Sunoco Energy Development Co. (Sunedco), the owner of another coal mine located along the nine mile segment above Coal Creek Junction.[11]
 
 
 34
 As will be seen infra, we rely upon the Commission's determination of the need for some competitive rail service in the Basin as a basis for upholding its approval of the construction of the connector line. It initially may appear inconsistent for the court to give weight in that situation to the public interest in competitive rail service but to reject Mobil's reliance on the same argument with respect to the nine mile segment. The reason for the difference is that Mobil deals with a segment of track that has a different construction history and Mobil seeks to reopen a Commission decision which by statute cannot be reopened except upon a showing of the existence of certain prescribed grounds. None of the required grounds have been established here.
 
 
 35
 Mobil began actively developing its coal mine in 1971-five years before the 1976 Decision. Brief of Mobil at 10. We presume that Mobil had actual notice, and in any event it certainly had constructive notice, that an application for joint construction and operation of a single line was under consideration by the Commission. Mobil is a great international corporation and is too sophisticated a company for us to presume otherwise. As noted above in the discussion on scope of review, we must evaluate the Commission's action based on the standard of whether it clearly abused its discretion in refusing to reopen the 1976 Decision. We cannot conclude on these facts, especially when forums for redress exist, see 1981 Decision, supra at 924, that the Commission clearly abused its discretion.
 
 
 36
 IV. The Connector Line and Public Convenience and Necessity
 
 
 37
 In No. 81-2038 Wyobraska contends that the Commission's approval of the connector line was improper because it did not have before it all the evidence necessary to make the statutorily required determination of public convenience and necessity. See Brief of Petitioners Wyobraska Landowners Association and Finley Company at 9-21 (Brief of Wyobraska); Reply Brief of Petitioners Wyobraska Landowners Association and Finley Company at 3-9 (Reply Brief of Wyobraska). Specifically, Wyobraska claims that the Commission did not have before it information about North Western's ability to finance construction of the connector line. Brief of Wyobraska at 13. In addition, Wyobraska has challenged the alleged need for the new construction, both in terms of the demand for the coal and in terms of the potential coal traffic that North Western could reasonably be expected to carry. Brief of Wyobraska at 30-46; Reply Brief of Wyobraska at 10-16.
 
 
 38
 A. Competitive Rail Service in the Powder River Basin
 
 
 39
 The Commission's finding that "the present or future public convenience and necessity require or permit the construction" of the connector line, see 49 U.S.C.A. § 10901 (1982 Supp.), rests primarily upon the determination that some competitive coal transport service is needed in that portion of the Basin where Burlington now has no rail competition. 1981 Decision, supra at 926. In reaching that decision, the Commission relied heavily on the testimony from coal shippers and consumers who testified of "service disruptions, unpredictable delivery schedules, uneven and inflated cycle times, inability to handle contracted tonnage, and the necessity for receivers to purchase additional cars to handle the tonnage in order to avoid penalty payment." Id. The Commission concluded that the entry of an additional carrier was likely to result in more efficient and responsive service, and that competition would have a moderating influence on rates. Id. at 927.
 
 
 40
 After noting that the accuracy of North Western's market projections was not crucial to its decision, since its primary reason for granting approval was to enhance competition in the Basin, id., the Commission nevertheless found that North Western's projections were reasonable. Id. at 928. The Commission expressly agreed with the approach of the ALJ to the coal traffic projections. Id.[12] The Commission also concluded that despite Burlington's efforts to improve its service and despite the size of its rolling stock which enables it to presently handle the coal originating in the Basin, a "strong need" still exists for another carrier to serve the Basin. An additional carrier would likely produce competitive benefits and would provide an alternative route out of the Basin in case of emergencies. Id. at 930.
 
 B. North Western's Financing Arrangements
 
 41
 Wyobraska argues that the Commission erred by not requiring North Western to provide information about its proposed financing for the connector line, contending that both the Commission's regulations and "the weight of its decisions establish that a necessary element in the decision to authorize new railroad construction is information about and findings on the financial ability of the applicant railroad to finance the construction." Brief of Wyobraska at 13 (emphasis added). Wyobraska suggests that the decision about public convenience and necessity depends in "very substantial measure" on the economic impact of the project on the applicant. Id. at 14.
 
 
 42
 Although it is the Commission's practice to examine the economic effect of a proposed construction project on the financial condition of the applicant, we believe that Wyobraska takes too rigid a view of the importance of that factor. The Commission's regulations merely provide that an "(a)pplicant's general plan for financing the proposed project" be set forth in its application for a certificate of public convenience and necessity. 49 C.F.R. § 1120.1(i) (1981). The regulations also contain a sample of the questionnaire to be filled out by applicants and one provision asks "to what extent funds for financing are not available." 49 C.F.R. § 1120.6(28) (1981). The nature of the financial information required by these regulations suggests that detailed, confirmed financing plans are not mandatory at the application stage.
 
 
 43
 The purpose underlying the Commission's requirement of financial information from the applicant is self-evident. The Commission desires to insure that applicants possess the financial ability to undertake and complete a proposed project. The prevailing procedure allows the Commission to identify applicants at the outset that may have insufficient financial backing to warrant approval of their projects.
 
 
 44
 Exceptions to this general procedure exist and it is within the Commission's sound discretion to determine in each case how to evaluate the proposed financing arrangements, or lack thereof. Wyobraska itself implicity conceded the legitimacy of exceptions to the Commission's ordinary procedure when it cited two cases in its brief that allowed exceptions. Brief of Wyobraska at 17 n.1. Wyobraska attempts to discount the importance of that case law by arguing that the Commission did not refer to either of those two cases to support its refusal to require information about North Western's financing plans. We note, however, that the Commission cited Construction of Line by Wenatchee Southern Ry. Co., 90 I.C.C. 237 (1924) in its 1976 Decision approving the construction of the joint line. The Commission approved that construction application even though neither Burlington nor North Western had "as yet made financial arrangements for the costs of construction or the purchase of operating equipment," because of the "substantial volume of traffic" that the coal mining operations would presumably generate for the joint line. 1976 Decision, supra at 401-02. In view of the well known potential of the Powder River Basin to generate coal tonnage, that was a reasonable conclusion at the time.
 
 
 45
 In Construction of Line by Wenatchee Southern Ry. Co., supra, the Commission approved, without considering financing arrangements, the construction of another railroad line for moving apples in the affected region. In explaining why it did not consider the financing arrangement at the time it approved the construction application, the Commission stated:
 
 
 46
 The significance of the financial aspect may vary in different cases.... Cases must be determined by the particular facts presented regarding them, and it is not possible to state a rule applicable alike to all. Circumstances may warrant the drawing of final conclusions regarding the financial aspect before the issuance of a certificate authorizing construction, or, conversely, may justify deferring such action.
 
 
 47
 Id. at 256.
 
 
 48
 The question of the terms upon which North Western will participate in the ownership and operation of the joint line has not yet been resolved. Burlington has taken the position that North Western's right to participate in the joint line expired by the terms of the Joint Line Agreement and of the supplemental agreements, when North Western failed to pay its share of costs for the joint line by the November 30, 1979 deadline. This position of the Burlington was rejected by the Commission in its November 30, 1979 decision[13] in which it reserved jurisdiction over the construction, financing, ownership and operation of the joint line, regardless of whether North Western paid its share of the construction costs by November 30, 1979. (J.A. Vol. I, 8.)
 
 C. The Commission's Show Cause Order
 
 49
 On February 19, 1982, five days before the oral argument in this case,[14] North Western filed with the Commission a "Petition for Order to Show Cause Why Terms of Joint Line Agreement, Except as Previously Modified by the Commission, Should Not Now be Prescribed," and on motion of Mobil the administrative record was supplemented by adding the petition.
 
 
 50
 On May 21, 1982, the Commission issued a show cause order directing the Burlington "to show cause why (the Commission) should not prescribe the terms and conditions of an agreement to own and operate the joint line."[15] The Commission stressed its preference that Burlington and North Western voluntarily negotiate a joint ownership and operating agreement. However, the Commission reiterated its readiness to unilaterally prescribe terms in the event the two carriers were unable to arrive at an agreement.[16] In accordance with the directive in its 1981 Decision that North Western tender its share of the project costs by August 23, 1982, the Commission stated that it would set the terms and conditions of the agreement unless the Burlington convinced the Commission that such a course would be ill-advised or unless the two carriers reached agreement before Burlington's response to its order was due.
 
 
 51
 On motion of Mobil and Wyobraska the administrative record was supplemented by adding the Commission's Show Cause Order. In moving for permission to supplement the administrative record, Wyobraska emphasized that North Western had never been required to show its financial ability to pay for construction of the connector line. Wyobraska argued that it was unwise for the Commission to approve construction of the connector line as a means of facilitating competition in the Basin when North Western has repeatedly failed to pay its share of the joint line construction and maintenance costs. Such a course would be unwise, Wyobraska urged, because without a showing of North Western's ability to finance both the construction of the connector line and its share of the joint line, the construction of the connector line might be commenced-with its attendant adverse environmental impact and condemnation or purchase of private land-only later to be halted or abandoned if North Western proved unable to obtain the requisite financing.
 
 
 52
 The events of recent months that are associated with North Western's application to the Commission for a show cause order first surfaced over six months after the Commission had issued its 1981 Decision, which is the subject of this review. These recent events therefore could not have influenced the Commission's decision. Nevertheless, the construction of the connector line is inextricably tied to the overall objective of trying to promote competitive rail service in the Basin. Although the construction of the connector line and the construction of the joint line were separate proceedings before the Commission, we cannot ignore the fact that the viability of the connector line depends directly upon the business generated by North Western along the joint line. The construction of the connector line was approved because it was determined to be the most cost efficient and least environmentally harmful way of insuring competitive rail service along the joint line. For these reasons, North Western's joint ownership and operation of the joint line form the linchpin for the public need for the connector line.
 
 
 53
 Based on the record before us, we are satisfied that the requisite financing has been arranged to insure that the connector line, once undertaken, will be constructed and completed. First, we refer to the verified statement of Louis T. Duerinck of North Western (Senior Vice-president-Law and Real Estate), in which he states that "North Western has commitments for the financing needed to meet the August 23, 1982 deadline."[17] Mr. Duerinck also stated, however, that the lenders will not make the funds available until the final terms, including the price, upon which North Western will gain access to the joint line have been determined. The Commission has already notified the Burlington and North Western that if they do not voluntarily negotiate the terms of a joint line agreement within fifty days following the service of the Commission's May 14, 1982 decision, the Commission will itself prescribe the terms and conditions for the joint ownership and operation of the joint line. The Commission has repeatedly stated that it will insist that the line approved in the 1976 Decision be jointly owned and operated. In view of the Commission's commitment to insuring competition along the joint line and in view of the demonstrated profitability of Burlington on the joint line, we find no evidence of arbitrariness or abused discretion in the Commission's decision to approve the construction of the connector line. In the unlikely event that North Western's financing should collapse, we agree with the Commission that little will have been lost since its authority was permissive only.
 
 
 54
 V. Wyobraska's Procedural and Environmental Objections
 
 
 55
 Wyobraska also raises a number of minor procedural and environmental objections that will be considered in turn.
 
 
 56
 A. Alleged Segmentation of Interdependent Projects
 
 
 57
 First, Wyobraska claims that the Commission violated the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347 (1976), by permitting segmentation of two allegedly totally interdependent projects: the connector line and the joint line. Brief of Wyobraska at 8b and 21-27. Because North Western's interest in both lines is said to be for the sole purpose of facilitating the transportation of coal originating on the joint line in the Southern Powder River Basin, Wyobraska argues that the Commission should have considered the total environmental impact of the entire project at the same time.
 
 
 58
 The Commission noted in its 1981 Decision that when North Western filed its original application for a single line through the Powder River Basin in 1973, it fully intended that coal originating from the Basin would be transported on its existing Fremont Line. No need was considered to exist for a connector line at that time and none was contemplated. Following the submission of the original North Western application in 1973, significant deterioration of the Fremont Line began. 1981 Decision, supra at 937. By the time the joint line was approved in the 1976 Decision it was known that some sort of rehabilitation of the Fremont Line would be needed to handle the anticipated weight of the heavy coal traffic from the joint line, but the costs of rehabilitation, both monetarily and environmentally, had not yet been ascertained. Once the full extent of the needed rehabilitation had been determined, it became clear that more extensive rehabilitation would be required than had originally been contemplated, and that it would be difficult to secure the requisite financing. Furthermore, the environmental impact statement revealed that the rehabilitation of the 519-miles of track to Fremont, Nebraska "would produce far greater adverse impacts on soils, water and ecology than those caused by construction of the 56-mile Connector Line." Id.
 
 
 59
 The Second Circuit in Greene County Planning Board v. Federal Power Commission, 559 F.2d 1227, 1232 (2d Cir. 1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), observed that "(a) balance must sometimes be struck between the importance of going forward with a project presently under consideration and the danger of improperly 'piggy-backing' several related projects by justifying each of them on the assumption that the others are to be constructed, only to discover later that the overall combination of the projects may do more harm than good." In the instant case, the balancing process is simplified by the Commission determination that competitive rail service is needed in the Basin if the tremendous coal resources of that region are to be harnessed in the public interest for national consumption. While the connector line appears to be duplicative of the Burlington's facilities, the Commission considers that the construction of the connector line is required to enable the North Western to provide viable competitive rail service. Given our conclusion that the Commission's decision requiring competition is sound-even if the Burlington has been required to date to finance its own competition-and since a number of other alternatives were carefully considered, including rehabilitation of the Fremont Line, and construction of the connector line was found to be a workable and environmentally acceptable proposal, we find that substantial evidence supports the Commission's decision that construction of the connector line would be in the public interest.
 
 B. The Mitigating Measures Ordered
 
 60
 A second objection raised by Wyobraska is that the Commission's 1981 Decision fails to require adequate measures to mitigate alleged environmental damage. Brief of Wyobraska at 8c-8d, 51-53. Wyobraska's real complaint appears to be that the "mitigating measures" ordered by the Commission only require North Western to apply them where "reasonably practicable." Wyobraska especially opposes provision 11(e) of the "measures" which permits North Western, in those situations in which the estimated cost of providing access, water or irrigation flow to a severed parcel equals or exceeds the value of the parcel, to offer to purchase the parcel for fair value. In the event the offer is made and then refused by the landowner, North Western is released from any obligation to provide access, water or irrigation flow. 1981 Decision, supra at 954 (App. A.). Because the Commission's order does not define "fair value," Wyobraska fears that without a more objective measure of value North Western will be able to exploit the situation and force landowners to accept unfair offers by the threat of not paying anything if the offer is refused. However, determinations of fair value proceed according to well settled legal principles. See, e.g. United States v. Crary, 2 F.Supp. 870, 879 (W.D.Va.1932).
 
 
 61
 The ALJ's initial decision contained extensive measures designed to mitigate the adverse environmental effects that might result from the construction of the connector line. The "mitigation measures," subsequently adopted by the Commission, cover paleontological and archaeological resources, irrigation flow, dust generation, property access, water supplies, and rainbow trout spawning. It is true that the ordered measures are couched in terms such as "reasonably practicable" and "reasonably required." However, we do not view that choice of language as suggesting that North Western may conduct negotiations in a manner that is not fully just and ethical. Implicit in the Commission's directive, we believe, is the obligation of good faith conduct. In the event that obligation were breached, the landowners would have complete access to the courts. They are in the same situation as landowners everywhere else in the nation when their property may be taken for a public purpose except that the Commission's order gives them some additional remedies. Hence, we conclude that Wyobraska's apprehensions are purely speculative at this point. The Commission has ordered a number of measures to minimize the damage and disruption that the construction of the connector line may cause.
 
 
 62
 C. Alternatives to Construction of the Connector Line
 
 
 63
 A third objection raised by Wyobraska is that the Commission failed to give serious consideration to alternatives to construction of the connector line. Wyobraska Brief at 8d, 54-58. Wyobraska does not dispute the fact that the Commission considered other alternatives but nevertheless argues that the other alternatives did not receive the "serious consideration" or "close scrutiny" to which they were entitled. Wyobraska's claim is refuted by the record. The environmental impact statement contains 45 pages devoted to a detailed discussion of alternatives to the construction of the connector line. In addition, the Commission cited specific reasons in its 1981 Decision as to why it concurred in the rejection of the other alternatives. For example, the Commission concluded that construction of the connector line was preferable to rehabilitation of North Western's Fremont Line-both in terms of cost efficiency and adverse environmental impact. 1981 Decision, supra at 939. The Commission also dismissed the alternative of allowing Burlington to be the exclusive carrier for coal originating in the Powder River Basin because that alternative is directly contrary to the Commission's central determination that competitive rail service in the Basin is necessary in the public interest. Id. The Commission pointed out that the prospect of a coal slurry pipeline is greatly hindered by the difficulties of securing the necessary rights-of-way and a sufficient long-term water supply.[18] Id. at 939-40. The Commission also noted major disadvantages connected with the proposal to construct power plants for mine mouth generation of electricity. That alternative would result in a greater consumption of energy, lower air quality, an inadequate water supply and rapid population growth. Id. at 940.
 
 
 64
 D. Supplemental Environmental Impact Statement
 
 
 65
 Another Wyobraska objection is that the Commission improperly refused to reopen the proceedings or to issue a supplemental environmental impact statement despite alleged significant changes in the proposed project. Brief of Wyobraska at 8f, 65-69. Wyobraska's main contention is that a supplemental environmental impact statement was required because of a proposed new routing of coal traffic. Id. at 67. This argument is based upon a November 12, 1980 North Western letter to the Administrator of the Federal Railroad Administration in which North Western opposed a proposal made by Burlington which would have permitted North Western to use the lines of the Burlington as an alternative to constructing the connector line. 1981 Decision, supra at 944. North Western opposed the proposal because it would eliminate the opportunity for North Western to originate westbound Basin coal. In addition it might preclude North Western's potential participation in coal movements to the West Coast for export to Pacific Rim nations. Id. The Commission observed that the November 12, 1980 correspondence in no way suggests that North Western would forego transporting coal to the Midwest and Southwest in order to participate in westbound coal traffic shipments; hence, the Commission concluded that the Basin coal would move substantially as outlined in the environmental impact statement. 1981 Decision, supra at 944-95. Furthermore, the Commission concluded that a supplemental environmental impact statement would not be required even if there were a change in traffic flows because in the continuing development of any project changes will be made to the original plan and a supplemental statement is not required unless the changes are substantial. Id. at 945. We agree that the suggested changes in traffic flow here would not present a substantial change in the project requiring the preparation of a supplemental impact statement.
 
 E. The Endangered Species Act
 
 66
 The final claim raised by Wyobraska is that the Commission allegedly violated the provisions of the Endangered Species Act, 16 U.S.C. §§ 1531-1543 (Supp. IV, 1980), by failing to conduct an adequate biological assessment of endangered species that might be affected by the project. Brief of Wyobraska at 8g, 70-73. The Act requires each federal agency to insure that "any action authorized, funded or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or result in the destruction or adverse modification of (critical) habitat ...." 16 U.S.C. § 1536(a)(2) (Supp. IV, 1980). To insure compliance with the foregoing provision, the Act directs that each agency "request of the (wildlife agency) information whether any (endangered or threatened) species which is listed or proposed to be listed may be present in the area of (a) proposed action." 16 U.S.C. § 1536(c)(1) (Supp. IV, 1980). If the wildlife agency advises that such a species may be present, the agency must "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." Id. The assessment must be completed within 180 days of the date on which it is initiated and before any contract for construction is entered into and before construction begins.
 
 
 67
 Wyobraska focuses on three endangered species: the bald eagle, the black-footed ferret and the blowout penstemon. Wyobraska asserts, relying upon the text of the environmental impact statement, that no consultation was held with the United States Fish and Wildlife Service regarding the bald eagle and the blowout penstemon.[19] The Commission in its 1981 Decision expressly rejects this assertion and stresses that notwithstanding the fact that explicit mention of consultation on each of the three species is not made in the environmental impact statement, the statement does state that the United States Fish and Wildlife Service was contacted early in the environmental evaluation process and that its concerns were incorporated into the analysis. 1981 Decision, supra at 940; see Proposed Final Environmental Impact Statement Coal Line Project at X. 44, Ex. 151, No. 81-2038 (EIS ).
 
 
 68
 The Commission also commented on the environmental impact statement's discussion of each of the endangered species. Attempts to document the presence of the blowout penstemon (a typically Western herbaceous plant with flowers) in the area of the proposed connector line proved unsuccessful. EIS, supra at II. 7. Apparently from the hearing testimony it was found that bald eagles are present in the area only during the winter months-the season of the year in which no construction would take place. Furthermore, the sighting of the bald eagles near existing rail lines suggests that this species would not be harmed by the construction of the connector line.
 
 
 69
 Wyobraska also argues that the work of the principal investigator who studied the species was preliminary in nature and inadequate to determine the effect on the species. Brief of Wyobraska at 72-73. In response to that contention, we accept as reasonable the position stated in the environmental impact statement: "If any endangered species are discovered during the ongoing studies over the rest of the Coal Line Project, formal consultation will again be instituted." EIS, supra at II. 9 (emphasis added).
 
 V. Conclusion
 
 70
 In these consolidated cases the petitioners are allied, albeit for totally different reasons, in their desire to have the Commission's 1981 Decision set aside. Mobil's central concern is to obtain joint rail service on the nine mile segment above the northern terminus of the joint line; Wyobraska's main hope is to block construction of the connector line which, if built, would result in the loss of a portion of their lands and would affect their ranching operations. In this latter connection the objectors are entitled to just compensation for their loss or damage; and our review of the record discloses that substantial evidence supports the decisions of the Commission-the entity to which Congress has delegated decisionmaking power in this instance. We therefore conclude that the Commission's 1981 Decision is reasonable and supports the earlier public interest determination that competitive rail service is needed along the joint line ; that the construction of the connector line will facilitate competitive rail service along the joint line; and that the record supports the conclusion that the National Environmental Policy Act was complied with in a satisfactory manner. Accordingly, Mobil's and Wyobraska's petitions for review are denied and the 1981 Decision of the Commission is affirmed.
 
 
 71
 Judgment accordingly.
 
 
 
 [1]
 The joint line was authorized by the Commission in Finance Docket No. 27579, Burlington Northern, Inc., and Chicago and North Western Transportation Company-Construction and Operation-Between Gillette and Douglas, in Campbell and Converse Counties, Wyoming, 348 I.C.C. 388 (1976)
 
 
 [2]
 North Western's connector line application was approved by the Commission in Finance Docket No. 28934, Chicago and North Western Transportation Company Construction and Operation of a Line of Railroad in Niobrara and Goshen Counties, Wyoming and in Sioux and Scotts Bluff Counties, Nebraska, 363 I.C.C. 906 (1981)
 
 
 [3]
 The joint line was built from Burlington's pre-existing Gillette Branch and extends in a southerly direction 101.1 miles to Shawnee Junction where it is bifurcated to connect with North Western's main line at Shawnee on the east and at Fisher on the west. The total length of the line is approximately 115.5 miles, 112.5 miles of which represents new construction. The first nine miles extending south from Burlington's pre-existing Gillette Branch is to be solely owned by Burlington and the remaining 103.5 miles is jointly owned. 1976 Decision, supra at 389
 
 
 [4]
 The administrative law judge struck from the Agreement a territorial provision that would have precluded North Western from transporting any coal via the joint line that was produced north of the joint line. 1981 Decision, supra at 914. A second provision struck by the administrative law judge was the merger buy-out clause. This clause, if approved, would have allowed Burlington to purchase North Western's one-half interest in the joint line in the event North Western decided to merge with any of several specified railroads. Id. The administrative law judge also disapproved a provision requiring the pooling of revenues and expenses on unit-train traffic that both originates and terminates on the joint line; he reworked a provision restricting the construction of spurs or additions to the joint line. Id. at 915
 
 
 [5]
 Burlington raised multiple objections before the Commission about the administrative law judge's decisions. Burlington claimed that the role of Union Pacific and one of its subsidiaries in the project should be examined more thoroughly. 1981 Decision, supra at 912. Burlington contended that the Joint Line Agreement expired by its own terms once North Western failed to pay its share of the construction costs by the November 30, 1979 deadline. Id. at 913. Burlington also maintained that no need for the connector line had been established and that its construction would be detrimental to the environment. Id. It seems obvious, once the joint line was constructed and operating, that the need was for a viable long-range competitor to the Burlington and for additional physical transportation facilities if such were necessary to meet the need
 
 
 [6]
 The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or ... unsupported by substantial evidence." 5 U.S.C. § 706(2)(A) & (E) (1976)
 
 
 [7]
 49 U.S.C. § 11344(b) provides:
 (b) In a proceeding under this section which involves the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall consider at least the following:
 (1) the effect of the proposed transaction on the adequacy of transportation to the public.
 (2) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.
 (3) the total fixed charges that result from the proposed transaction.
 (4) the interest of carrier employees affected by the proposed transaction.
 (5) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region.
 (Emphasis added).
 
 
 [8]
 Mobil contends that competition along this portion of track is so significant because 35 to 40 percent of the coal mined in the Powder River Basin originates from that area. 1981 Decision, supra at 922
 
 
 [9]
 The Commission called attention to the unusual procedural status of the case at the time of the 1981 Decision. Burlington claimed that there remained no "agreement" to approve since North Western had failed to meet the November 30, 1979 deadline. Furthermore, the Commission was reluctant, after the North Western had failed to make any contribution to the cost of the constructing the joint line, as required by the joint line agreement, to impose additional burdens on Burlington in this instance since the Burlington was in a position in which it was essentially forced to accept the joint operating agreement because that joint line had been constructed pursuant to a certificate that only authorized joint construction and refusal to operate the line jointly would violate the terms of the certificate. 1981 Decision, supra at 923 n.16 & accompanying text
 
 
 [10]
 The Commission expressly noted that there was no hint in the record that Burlington would have agreed, absent Commission intervention, to submit a joint proposal. 1981 Decision, supra at 925
 
 
 [11]
 Sunedco brought suit against Burlington and North Western, claiming that the territorial provision of the Joint Line Agreement violated federal antitrust law and section 11342 of the Interstate Commerce Act. Section I(C) of the Joint Line Agreement would have precluded North Western from originating via the joint line any coal produced north of the joint line. 1981 Decision, supra at 914. After the ALJ disapproved the territorial provision in the prehearing conference, Sunedco and the two carriers agreed to settle the claims. Burlington agreed to construct a turnout and switch to connect a spur from one of Sunedco's mines. Burlington also conveyed an easement on its right-of-way to Sunedco, thereby enabling Sunedco to build a spur from its mine to the joint line. The terms of the settlement limit use of the easement exclusively to the transportation of coal from Sunedco's mine; Sunedco may not use the easement to transport coal from other mining properties. Id. at 923
 
 
 [12]
 The Commission specifically reviewed and approved the administrative law judge's handling of several challenges to the projections, including the possibility of a coal slurry pipeline, 1981 Decision, supra at 928-29; changes in federal emission standards that might reduce the attractiveness of the Basin's low-sulfur coal, id. at 929; the uncertainty as to whether some supporting utilities would definitely use North Western's services, id.; and the current national trend of reduced coal consumption, id. The Commission also concluded that North Western's traffic projections might be understated since its estimates did not include coal from the Sunedco mine that became available for competitive shipment following the adoption of the settlement agreement. Id. at 930. As further support for its conclusion that North Western's projections might be understated, the Commission pointed to the fact that although the initial decision concluded that total expected coal traffic levels from the Basin would exceed 80 million tons annually by 1992, Burlington alone in October 1980 was already transporting coal at a rate of 100 million tons per year. Also, it is well known that the Basin's coal reserves are enormous
 
 
 [13]
 Finance Docket No. 29066F, Application of Chicago and North Western Transportation Company for Approval of the Terms of Construction, Ownership and Operations of a Line of Railroad Presently Under Construction in Campbell and Converse Counties, Wyoming (Nov. 30, 1979)
 
 
 [14]
 Oral argument was heard on February 24, 1982. Mobil apparently was first served with a copy of the petition on February 23, 1982. Mobil explained that the unexpected notice of the petition on the eve of oral argument did not allow it sufficient time before argument to prepare a motion seeking to supplement the record
 
 
 [15]
 Finance Docket No. 29066, Chicago and North Western Transportation Company Approval of Terms of Construction, Ownership and Operation of a Line of Railroad in Campbell and Converse Counties, Wyoming (May 14, 1982) p. 7
 
 
 [16]
 Id. at 5. See Finance Docket No. 29066F served November 30, 1979 (J.A. Vol. I, 6.); 1981 Decision, supra at 920
 
 
 [17]
 Verified Statement of Louis T. Duerinck, p. 22. This statement is included in North Western's Petition for Order to Show Cause Why Terms of Joint Line Agreement, Except as Previously Modified by the Commission, Should Not Now be Prescribed
 
 
 [18]
 The report of recent developments with slurry line promoters attempting to purchase Missouri River water from the State of South Dakota, with some initial success, might ease the water problem, but additional obstacles are substantial
 
 
 [19]
 The environmental impact statement does expressly state that formal consultation was held with the United States Fish and Wildlife Service to assess the effect of the joint line on the black-footed ferret, even though no black-footed ferrets had been seen in the area. Proposed Final Environmental Impact Statement Coal Line Project at II. 9, Ex. 151, No. 81-2038. It was concluded that the construction of this portion of the coal line project would not affect the continued existence of the black-footed ferret